[No. C050889. Third Dist. Aug. 30, 2007.]

TEACHERS' RETIREMENT BOARD, as Manager, etc., et al., Plaintiffs and Appellants, v.
MICHAEL C. GENEST, as Director, etc., Defendant and Appellant;
JOHN CHIANG, as State Controller, etc., Defendant and Respondent;
CALIFORNIA RETIRED TEACHERS ASSOCIATION, Intervener and Appellant.

1016

1018

## COUNSEL

Olson, Hagel & Fishburn, Deborah B. Caplan, N. Eugene Hill and Richard C. Miadich for Plaintiffs and Appellants.

Mary Ellen Signorille, Melvin Radowitz and Barbara A. Jones for AARP as Amicus Curiae on behalf of Plaintiffs and Appellants and on behalf of Intervener and Appellant.

Stevens & O'Connell and Steven S. Kimball for Arkansas Retired Teachers Association, Maryland Retired School Personnel Association, Montana Retired Educators Association, New York State Retired Teachers' Association, Utah Retired School Employees Association, and Wisconsin Retired Educators' Association as Amici Curiae on behalf of Plaintiffs and Appellants and on behalf of Intervener and Appellant.

Nossaman, Guthner, Knox & Elliott and John T. Kennedy for Defendant and Appellant.

Seyfarth Shaw, Kurt A. Kappes and Jason T. Cooksey for Intervener and Appellant.

No appearance for Defendant and Respondent.

OPINION

**SCOTLAND, P. J.**—While California was in a period of fiscal plight in 2003, the Legislature passed, and Governor Davis signed, Senate Bill No. 20X1 (2003–2004 1st. Ex. Sess.) (Senate Bill 20), reducing the state's obligation to fund the Supplemental Benefit Maintenance Account of the Teachers' Retirement Fund by $500 million for fiscal year 2003–2004.

The Teachers' Retirement Board (TRB), as manager of the California State Teachers' Retirement System (CalSTRS), then filed a petition for writ of mandate and a complaint for declaratory and injunctive relief against the Director of the Department of Finance (DOF), claiming that Senate Bill 20 is unconstitutional because it violates the contract clause of both the state and federal Constitutions and interferes with TRB's plenary authority to administer the assets of CalSTRS. TRB successfully moved for summary judgment on the first ground.

DOF appeals, arguing that the trial court erred in finding Senate Bill 20 unconstitutional, and that the court should not have addressed the issue because the controversy is not ripe for adjudication.

TRB cross-appeals, asserting that the trial court erroneously failed to address whether Senate Bill 20 unconstitutionally interferes with TRB's plenary authority. TRB and the California Retired Teachers Association, which intervened in the action, also cross-appeal claiming that the court wrongly awarded prejudgment interest at a rate of 7 percent, rather than 10 percent, per annum.

As we will explain, the trial court (1) correctly determined that the challenged portion of Senate Bill 20 violates the contract clauses of the state and federal Constitutions and that the matter is ripe for adjudication, (2) properly declined to address TRB's alternate constitutional challenge that Senate Bill 20 interferes with TRB's plenary authority to administer the assets of CalSTRS, but (3) erred in awarding prejudgment interest at a rate of 7 percent, rather than 10 percent, per annum. We shall so modify the judgment and affirm it as modified.

DISCUSSION

I

The allowance that a retiree receives from CalSTRS is composed of three main components: (1) a retirement allowance under the defined benefit program (Ed. Code, §§ 22002, 22122.5; further section references are to the

Education Code unless otherwise specified); (2) an annual adjustment of 2 percent per year (§ 22140); and (3) a purchasing power supplemental payment (§ 24415). The third component is paid from the Teachers' Retirement Fund's Supplemental Benefit Maintenance Account (the SBMA) to retirees whose current defined benefit program allowance has fallen below 80 percent of the purchasing power of the initial allowance due to inflation. (§ 24415.)[1]

The SBMA is funded by state contributions from the General Fund. (§ 22954, subd. (a).) The purchasing power supplemental payments are made to retirees on a quarterly basis (§ 24415, subd. (a)) and are "payable only to the extent that funds are available from the [SBMA]." (§ 24415, subd. (d).) If the TRB determines that the SBMA will not have sufficient funds to provide purchasing power of up to 80 percent for the following fiscal year, it can do one of three things: (1) increase the employer contributions, which must be approved in the Budget Act; (2) reduce the supplemental payment for the following year; or (3) transfer funds from the Teachers' Retirement Fund if it has no unfunded obligations. (§ 24416.)[2] However, if funds remain in the SBMA after making purchasing power supplemental payments of 80 percent, then "those funds shall remain in the [SBMA] for allocation in future years." (§ 24415, subd. (b).)

Prior to 1998, the purchasing power benefit provided by the SBMA was not a vested right. Former section 24414, subdivision (d), expressly stated

---

[1] Section 24415 states in pertinent part: "(a) The proceeds of the [SBMA] shall be distributed annually in quarterly supplemental payments commencing on September 1, 1990, to retired members, disabled members, and beneficiaries . . . . The amount available for distribution in any fiscal year shall not exceed the amount necessary to restore purchasing power up to 80 percent of the purchasing power of the initial monthly allowance after the application of all allowance increases authorized by this part . . . ."

[2] Section 24416 states in pertinent part: "(a) If the board determines by June 30 of the then current fiscal year that the [SBMA] will not have sufficient funds to provide purchasing power of up to 80 percent for the subsequent fiscal year, the board, for that year, may do either, or a combination of the following: [¶] (1) Increase the employer contribution rate commencing in the next fiscal year by an amount that would provide sufficient funds for no more than the estimated difference between the funds in the [SBMA] and the amount needed to pay the benefit level specified by the board, provided the benefit level is no more than 80 percent. Notwithstanding any other provision of this part, the increase in the employer contribution rate shall only become operative if the increase is approved or authorized in the Budget Act. [¶] (2) Reduce the supplemental benefit payment for the subsequent fiscal year to the amount that can be funded by the available funds in the [SBMA]. [¶] (b) If the board finds that there is no unfunded obligation, as determined by the board's professional consulting actuary and affirmed by the Director of Finance, then in addition to the authority pursuant to subdivision (a), the board may transfer to an auxiliary [SBMA], from any funds that are in excess of the amount needed to fund fully the benefits for which the Teachers' Retirement Fund is liable, an amount that would provide sufficient funds for no more than the estimated difference between the funds in the [SBMA] and the amount needed to pay the benefit level specified by the board, provided the benefit level is no more than 80 percent."

that "nothing in the sections establishing the Supplemental Benefit Maintenance Program shall be construed as a basis for any implied contractual obligation, or as an element of exchange of consideration by a private party for consideration offered by the state, or as an intent to grant private rights of contract, or as conferring any vested right whatsoever on any present or future member . . . ." (Stats. 1996, ch. 1165, § 34, pp. 8505, 8506.)

Similarly, former section 22954, subdivision (d) stated that "the Legislature reserves the right to reduce or terminate the state's contributions to the [SBMA] in the Teachers' Retirement Fund provided by this section and to reduce or terminate the distributions required by Section 24415." (Stats. 1993, ch. 893, § 2, pp. 4867, 4928.)

However, the statutory landscape changed in 1998, due to Assembly Bill No. 1102 (1997–1998 Reg. Sess.) (Assembly Bill 1102), which was part of a package of changes to the Teachers' Retirement Law negotiated between the Legislature, the Governor, and CalSTRS. Assembly Bill 1102 repealed sections 24414 and 22954, and added a new section 22954, in part as follows: "(a) [C]ommencing July 1, 1999, a continuous appropriation is hereby annually made from the General Fund to the Controller, pursuant to this section, for transfer to the [SBMA] in the Teachers' Retirement Fund. *The total amount of the appropriation for each year shall be* equal to 2.5 percent of the total of the creditable compensation of the immediately preceding calendar year upon which members' contributions are based for purposes of funding the supplemental payments authorized by Section 24415. [¶] . . . [¶] (c) *It is the intent of the Legislature in enacting this section to establish the supplemental payments pursuant to Section 24415 as vested benefits pursuant to a contractually enforceable promise to make annual contributions from the General Fund to the [SBMA] in the Teachers' Retirement Fund in order to provide a continuous annual source of revenue for the purposes of making the supplemental payments under Section 24415.*" (Stats. 1998, ch. 1006, § 5, italics added; see *id.*, §§ 4, 9.)[3]

Assembly Bill 1102 was linked to Assembly Bill No. 2804 (1997–1998 Reg. Sess.) (Assembly Bill 2804) such that the bills would become effective only if both were enacted and became operative. (Stats. 1998, ch. 1006, § 14; Stats. 1998, ch. 967, § 5.) In conjunction with other bills not relevant to this

---

[3] As amended, section 22954 specified that "[t]he total amount of the appropriation for each year shall be equal to 2.5 percent of the total of the creditable compensation of the immediately preceding *calendar year* upon which members' contributions are based for purposes of funding the supplemental payments authorized by Section 24415." (Italics added.) In 2000, the Legislature revised the section to provide that commencing July 1, 2003, contributions "shall be equal to 2.5 percent of the total of the creditable compensation of the *fiscal year* ending in the immediately preceding calendar year . . . ." (Stats. 2000, ch. 1021, § 35, italics added.)

appeal, Assembly Bill 1102 represented the benefit portion of the aforesaid agreement between CalSTRS, the Legislature, and the Governor, while Assembly Bill 2804 contained the funding component of the package. (Assem. Conc. in Sen. Amends. to Assem. Bill No. 1102 (1997–1998 Reg. Sess.) p. 2.) Assembly Bill 2804 decreased the state's contribution to the defined benefit program from 4.3 percent to 3.102 percent of the annual total creditable compensation and reamortized CalSTRS unfunded liability to the year 2027. (Former § 22955, subd. (a); Stats. 1998, ch. 967, § 4; cf. former § 22955, Stats. 1997, ch. 482, § 20.) The Legislature estimated this would result in cost savings to the state of $577 million, $158 million, and $213 million in fiscal years 1998–1999, 1999–2000, and 2000–2001 respectively. (Assem. Conc. in Sen. Amends. to Assem. Bill No. 2804 (1997–1998 Reg. Sess.) p. 2.)

Thus, the Legislature decreased its contributions to the defined benefit program but (1) contractually obligated the state to make contributions to the SBMA, (2) mandated that the contributions "shall be" a specified percentage of the total creditable compensation, and (3) eliminated the Legislature's statutory right under former section 24414 to reduce or terminate the contributions to the SBMA. Indeed, the legislative history indicates that under existing law, there was no guarantee that the state would not reduce funding to the SBMA, but that this law would be altered by Assembly Bill 1102, which "vests the funding stream at its current level"; i.e., 2.5 percent of the total creditable compensation. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1102 (1997–1998 Reg. Sess.) as amended Aug. 27, 1998, p. 2.)

In 2003, the Legislature passed Senate Bill 20, which amended section 22954 to decrease the state's contribution to the SBMA in part as follows: "(b) The total amount of the appropriation for each year shall be equal to 2.5 percent of the total of the creditable compensation of the fiscal year ending in the immediately preceding calendar year upon which members' contributions are based for purposes of funding the supplemental payments authorized by Section 24415. *However, for the 2003–04 fiscal year only, that appropriation is reduced by five hundred million dollars ($500,000,000).*" (Stats. 2003, 1st Ex. Sess. 2003, ch. 6, § 2, italics added.)

As part of Senate Bill 20, the Legislature enacted section 22954.1, which provides that every four years an actuarial evaluation shall be made of the anticipated ability of the SBMA to provide the purchasing power protection during each fiscal year until June 30, 2036. (§ 22954.1, subd. (a); Stats. 2003, 1st Ex. Sess. 2003, ch. 6, § 3.) If the evaluation discloses that the funds in the SBMA will be insufficient, then money will be appropriated from the General Fund to cover the shortfall. (§ 22954.1, subd. (b).) "The aggregate amount of

funds appropriated pursuant to subdivision (b) is limited to an amount equal to five hundred million dollars ($500,000,000) adjusted by the actual rate of return on funds in the [SBMA] from July 1, 2003, after taking into account any amount previously appropriated pursuant to subdivision (b)." (§ 22954.1, subd. (c).) Section 22954.1 becomes inoperative on July 1, 2036, and is repealed effective January 1, 2037, unless a statute is enacted before January 1, 2037, and deletes or extends the dates on which the statute becomes inoperative and is repealed. (§ 22954.1, subd. (d).)

As a result of Senate Bill 20, the payment from the General Fund to the SBMA was reduced from $558,867,986 to $58,867,986 for fiscal year 2003–2004. The Legislature replaced the $500 million obligation with a contingent obligation to transfer this sum to the SBMA over a 33-year period, conditioned upon a determination by an actuary establishing that this sum or any portion thereof is needed to meet the purchasing power protection benefit obligations in any year between 2006 and July 2036, which determination must be certified by DOF. If an actuary determines that the SBMA is able to provide 80 percent purchasing power protection until July 2036, and the operative period of section 22954.1 is not extended, then the $500 million the Legislature deducted from its obligation to fund the SBMA will never be reimbursed.

In enacting Senate Bill 20, the Legislature specifically found that the SBMA currently has sufficient funds to provide purchasing power protection through the year 2035 and that the periodic actuarial evaluations will provide sufficient time to address erosion in the funding status of the system before those erosions have a negative impact on benefits. (Stats. 2003, 1st Ex. Sess. 2003, ch. 6, § 1.) The Legislature further found that "[i]t is in the best interest of the people of the State of California, in this time of fiscal crisis, to recognize the state's responsibilities as a sovereign state to revise prior commitments, if that revision does not impair the intent and effect of any contractual obligation." (*Ibid.*) The Governor signed Senate Bill 20 " 'because it is an important step toward balancing the state budget.' " (Historical and Statutory Notes, 26E West's Ann. Ed. Code (2007 supp.) foll. § 22954, p. 19.)

## II

On October 14, 2003, TRB filed a petition for writ of mandate and complaint for injunctive and declaratory relief against DOF, alleging that the alteration of the state's obligation to fund the SBMA is an unconstitutional impairment of vested contract rights and of TRB's plenary authority to administer CalSTRS. The California Retired Teachers Association (CRTA) intervened in the action.

On June 4, 2004, TRB moved for summary judgment, claiming that it was entitled to judgment as a matter of law. TRB asserted that (1) the right to a specific contribution to the SBMA conferred by section 22954 is a vested, enforceable contract right; (2) Senate Bill 20, which reduced the contribution by $500 million, impaired this right in violation of the contract clause of both the state and federal Constitutions (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9); and (3) Senate Bill 20 interfered with TRB's constitutionally endowed plenary authority to administer the CalSTRS assets (Cal. Const., art. XVI, § 17). CRTA joined in TRB's summary judgment motion.

DOF opposed the motion, disputing that Senate Bill 20 impairs TRB's plenary authority. As for the claimed impairment of contract rights, DOF asserted that the controversy was not ripe for adjudication. Furthermore, DOF argued, Senate Bill 20 did not result in an impairment of contract because the evidence disclosed that the SBMA was actuarially sound and able to provide the 80 percent supplemental protection payments through the year 2036, which meant the retirees would receive the payments to which they were entitled. According to DOF, requiring contributions to the SBMA in an amount greater than necessary to fund the requisite supplemental payments would result in an unintended windfall and be an impermissible gift of public funds. DOF also raised the defense of necessity with respect to the reduction of the funding obligation, but later abandoned the defense.

The parties submitted a statement of facts, which they stipulated were undisputed with a few exceptions. They also stipulated that the majority of the evidence submitted by the parties was admissible, again with a few exceptions.

The trial court granted the motion for summary judgment, ruling as follows: The controversy was ripe because it had reached the point that the facts had congealed sufficiently to permit an intelligent and useful decision to be made. The undisputed facts established a violation of the contract clauses of the state and federal Constitutions because (1) Assembly Bill 1102 expressly created a vested contractual right to annual transfers of a specified amount of money into the SBMA, which transfer was not dependent upon the actuarial soundness of the SBMA; (2) Senate Bill 20 impairs this vested right by reducing the amount of money for fiscal year 2003–2004 for reasons external to the successful operation of the pension system; and (3) Senate Bill 20 disadvantages the employees, who are the beneficiaries of the pension plan, without providing a comparable new advantage. The proposed repayment of the deducted funds set forth in section 22954.1 is not a comparable new advantage because it merely substitutes a fixed payment with a deferred contingent payment for a limited period of time, and deprives the SBMA of the opportunity to generate investment returns that might be used to fund future benefits.

The trial court observed that DOF had dropped its defense of necessity, thus the court did not need to decide whether the impairment to the SBMA fund nevertheless was constitutional because it is either a minimal impairment narrowly tailored to conform with an ostensibly innocent governmental purpose, or a substantial impairment that is reasonable and necessary to serve an important public purpose. Rejecting DOF's claim that requiring the SBMA to be funded in an amount greater than needed to provide 80 percent purchasing power protection is an unlawful gift of public funds, the court observed that the money is being used for a public purpose in consideration for public school teachers' continued employment.

Having decided that the challenged provisions of Senate Bill 20 constituted an unconstitutional impairment of contract, the trial court concluded it was unnecessary to consider TRB's other constitutional challenge, namely, that Senate Bill 20 violates the plenary authority vested in TRB by article XVI, section 17 of the California Constitution.

The trial court entered judgment in favor of TRB and CRTA, and awarded prejudgment and postjudgment interest at the rate of 7 percent per annum until the $500 million is deposited in the SBMA in accordance with the terms of the judgment.

### III

DOF does not dispute the trial court's determination that a vested contractual right exists. Rather, DOF contends that (1) the court erred in determining the nature and extent of the state's contractual obligation to fund the SBMA, and (2) when this obligation is construed properly, Senate Bill 20 does not result in an unconstitutional impairment of contract. Before addressing this contention, it is helpful to set forth the legal framework that guides our review.

### A

The contract clauses of both the federal and California Constitutions prohibit a state from passing laws impairing the obligation of contracts. (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.) Pursuant to these clauses, the state's ability to modify its own contracts with other parties, or contracts between other parties, is limited. (*Allen v. Board of Administration* (1983) 34 Cal.3d 114, 119 [192 Cal.Rptr. 762, 665 P.2d 534]; *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 783 [189 Cal.Rptr. 212].)

Not every impairment runs afoul of the contract clauses, however. " 'The constitutional prohibition against contract impairment does not exact a rigidly

literal fulfillment; rather, it demands that contracts be enforced according to their "just and reasonable purport"; not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. [Citations.] . . . ' [Citations.]" (*Allen v. Board of Administration, supra*, 34 Cal.3d at pp. 119–120.)

And because it is a sovereign power, the state occupies a unique position, giving rise to principles that may limit whether an impairment has occurred as a matter of constitutional law. (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1130 [61 Cal.Rptr.2d 207].) "An attempt must be made 'to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power . . ." . . .' [citation]." (*Allen v. Board of Administration, supra*, 34 Cal.3d at p. 119.) " 'The contract clause and the principle of continuing governmental power are construed in harmony; although not permitting a construction which permits contract repudiation or destruction, the impairment provision does not prevent laws which restrict a party to the gains "reasonably to be expected from the contract." [Citation.] Constitutional decisions "have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change." [Citations.]' [Citations.]" (*Id.* at p. 120.)

Thus, "[o]ur analysis requires a two-step inquiry into: (1) the nature and extent of any contractual obligation . . . and (2) the scope of the Legislature's power to modify any such obligation." (*Valdes v. Cory, supra*, 139 Cal.App.3d at p. 785; accord, *Board of Administration v. Wilson, supra*, 52 Cal.App.4th at p. 1131.)

DOF contends the trial court misinterpreted the statutes enacted by Assembly Bill 1102, and as a consequence, it erred in determining the nature and extent of the parties' contractual rights and obligations.

■ The fundamental goal of statutory construction is to ascertain the intent of the Legislature so as to effectuate the purpose of the statute. (Code Civ. Proc., § 1859; *People v. Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420].) In construing a statute, we begin by examining the statutory language, giving the words their usual and ordinary meaning, because the words of a statute ordinarily provide the most reliable indication of legislative intent. (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152 [69 Cal.Rptr.2d 329, 947 P.2d 291].)

We interpret the language of the statute "in context, examining other legislation on the same subject, to determine the Legislature's probable intent." (*California Teachers Assn. v. Governing Bd. of Rialto Unified School*

*Dist.* (1997) 14 Cal.4th 627, 642 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) The statutory language is construed in light of the entire statute and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose. [Citation.]" (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166]; see *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [87 Cal.Rptr.2d 222, 980 P.2d 927].) We avoid an interpretation that renders any portion of the statute superfluous, unnecessary, or a nullity; this is so because we presume that the Legislature does not engage in idle acts. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist., supra,* 14 Cal.4th at p. 634; *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1058–1059 [48 Cal.Rptr.2d 1, 906 P.2d 1057].)

█ If there is no ambiguity in the language of a statute, we presume that the Legislature meant what it said and that the plain meaning governs. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; *People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313].) Where ambiguity exists, we consider and examine the history and background of the provision to ascertain the most reasonable interpretation. (*People v. Birkett* (1999) 21 Cal.4th 226, 231–232 [87 Cal.Rptr.2d 205, 980 P.2d 912]; *Delaney v. Baker* (1999) 20 Cal.4th 23, 29–30 [82 Cal.Rptr.2d 610, 971 P.2d 986].)

The construction of a statute presents solely a question of law subject to independent review. (*Hernandez v. Modesto Portuguese Pentecost Assn.* (1995) 40 Cal.App.4th 1274, 1280 [48 Cal.Rptr.2d 229]; *Harris v. Mothers Against Drunk Driving* (1995) 40 Cal.App.4th 16, 20 [46 Cal.Rptr.2d 833].) The same is true with respect to whether a vested contractual right exists, and whether an impairment of this right is unconstitutional. (*Board of Administration v. Wilson, supra,* 52 Cal.App.4th at p. 1129.) The question of whether there is an impairment is a mixed question of fact and law. (*Ibid.*) Where, as here, the material facts are not in dispute and the parties simply dispute the legal significance of the facts, the matter may be resolved on summary judgment as a matter of law. (*Fagundes v. American Internat. Adjustment Co.* (1992) 2 Cal.App.4th 1310, 1314 [3 Cal.Rptr.2d 763]; see *Hernandez v. Modesto Portuguese Pentecost Assn., supra,* 40 Cal.App.4th at p. 1280.)

On appeal from a summary judgment, as with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error, and our review is limited to issues that have been raised and briefed adequately. (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 115 [113 Cal.Rptr.2d 90].)

B

The trial court determined that Assembly Bill 1102 created a vested enforceable right to a continuous annual transfer from the General Fund to the SBMA in an amount of 2.5 percent of the total creditable compensation, and that this right was not limited to only the amount of funds necessary to maintain the actuarial soundness of the SBMA.

According to DOF, the trial court's interpretation of the contractual rights bestowed by Assembly Bill 1102 is too rigid and literal. In DOF's view, the vested right created by Assembly Bill 1102 is limited to the transfer of *up to* 2.5 percent of the total creditable compensation to the extent these funds are needed to make the purchasing power protection benefit payments under section 24415, but there is no vested right to the transfer of this money if the SBMA is actuarially sound and capable of providing the supplemental benefit payments.

DOF bases its interpretation of Assembly Bill 1102 on the statutory language stating that the contributions to the SBMA are made "for purposes of funding the supplemental payments authorized by Section 24415" and "for the purposes of making the supplemental payments under Section 24415." (Former § 22954, subds. (a), (c).) DOF posits that as long as the SBMA is actuarially sound and money is available to pay the retirees' supplemental payments, the state has met its funding obligation and need not make the 2.5 percent contribution mandated by section 22954 because the money is not needed for the "purposes of" funding or making the supplemental payments.

DOF's argument is too simplistic, relies on language taken out of context, and fails to consider the entire statutory scheme and the changes thereto.

Before Assembly Bill 1102, there was no vested right to payments from the General Fund into the SBMA program. Former section 24414, subdivision (d), expressly provided that "nothing in the sections establishing the Supplemental Benefit Maintenance Program shall be construed as a basis for any implied contractual obligation . . . or as an intent to grant private rights of contract, or as conferring any vested right whatsoever on any present or future member . . . ." (Stats. 1996, ch. 1165, § 34, pp. 8505, 8506.) More importantly, former section 22954, subdivision (d) provided that *"the Legislature reserves the right to reduce or terminate the state's contributions to the [SBMA] in the Teachers' Retirement Fund provided by this section* and to reduce or terminate the distributions required by Section 24415." (Stats. 1993, ch. 893, § 2, pp. 4867, 4928, italics added.)

Assembly Bill 1102 repealed sections 24414 and 22954, and added a new section 22954, in part as follows: "(a) [C]ommencing July 1, 1999, a

continuous appropriation is hereby annually made from the General Fund to the Controller, pursuant to this section, for transfer to the [SBMA] in the Teachers' Retirement Fund. *The total amount of the appropriation for each year shall be equal to 2.5 percent of the total of the creditable compensation* of the immediately preceding calendar year upon which members' contributions are based for purposes of funding the supplemental payments authorized by Section 24415. [¶] . . . [¶] (c) *It is the intent of the Legislature in enacting this section to establish the supplemental payments pursuant to Section 24415 as vested benefits pursuant to a contractually enforceable promise to make annual contributions from the General Fund to the [SBMA] in the Teachers' Retirement Fund in order to provide a continuous annual source of revenue for the purposes of making the supplemental payments under Section 24415.*" (Stats. 1998, ch. 1006, § 5, italics added; *id.*, §§ 4, 9.)

Ignoring the statutory language stating that the Legislature intended "to establish the supplemental payments . . . as vested benefits pursuant to a contractually enforceable promise to make annual contributions from the General Fund to the [SBMA] . . . in order to provide a continuous annual source of revenue," DOF chooses to concentrate only on the language "for the purposes of making the supplemental payments under Section 24415." Assembly Bill 1102 did not simply give CalSTRS members a vested right to receive purchasing power supplemental payments under section 24415; it created a contractually enforceable right to annual state contributions of a specified amount into the SBMA. The plain language of the version of section 22945 enacted by Assembly Bill 1102 provides that (1) the state will make an annual appropriation of money from the General Fund for transfer to the SBMA, (2) this appropriation shall be in an amount equal to 2.5 percent of the creditable compensation, and (3) the promise to make these annual contributions from the General Fund to the SBMA is contractually enforceable.

 The fact that the stated purpose of this guaranteed funding stream is to provide for the purchasing power supplemental payments merely means that the state's contribution may be used only for this purpose. It does not mean that the state's obligation to make the requisite transfer is dependent upon there being insufficient funds in the SBMA to make the supplemental payments, or that if the SBMA funds are sufficient to cover the supplemental payments, then the state's funding obligation is reduced. There is nothing in the statutory language making the funding obligation contingent upon the existence of any specific factors, including actuarial soundness. Indeed, the language that made the funding obligation contingent was eliminated by the Legislature when it repealed former section 22954, which gave the Legislature "the right to reduce or terminate the state's contributions to the [SBMA] in the Teachers' Retirement Fund . . . ." (Stats. 1993, ch. 893, § 2, pp. 4867, 4928.) If the Legislature intended to continue to reserve the right to

reduce the SBMA contributions when it deemed the contributions unnecessary, it would not have, or should not have, repealed this language via Assembly Bill 1102. "By these means a commitment to permanency of funding was made." (Cf. *California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 506 [202 Cal.Rptr. 611] [holding the state's failure to fund the Teachers' Retirement Fund in accordance with statutory terms constituted an impairment of contract].)

Our interpretation of the relevant statutory language is supported by a bill analysis of Assembly Bill 1102 from the Senate Rules Committee, which states: "Under current law, the General Fund transfers an amount equal to 2.5% of prior year payroll to the [SBMA] to fund a supplemental benefit which maintains the purchasing power of the STRS allowance at 75% of the value of the original allowance.[4] However, there is no guarantee that the state wouldn't reduce that funding. *This bill vests the funding stream at its current level.*" (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1102 (1997–1998 Reg. Sess.) as amended Aug. 27, 1998, p. 2, italics added.)

Indeed, the Legislative Counsel's Digest states "[t]he State Teachers' Retirement Law requires specified amounts to be annually transferred to the Supplemental Benefit Maintenance Account in the Teachers' Retirement Fund for the purpose of funding supplemental benefit payments. [¶] *This bill would* repeal that provision and instead *require a continuous appropriation to be annually made from the General Fund to that account in a specified amount* for purposes of funding these supplemental payments. *The bill would make a statement of legislative intent respecting the contractual obligation of those annual appropriations* and would make related changes." (Legis. Counsel's Dig., Assem. Bill No. 1102 (1997–1998 Reg. Sess.) Stats. 1998, ch. 1006, italics added.)

Thus, both the plain language of the statute and the legislative history indicate Assembly Bill 1102 contractually obligated the state to make an annual contribution of 2.5 percent of creditable compensation into the SBMA.

Rather than attempting to explain why the legislative history and the repeal of former sections 24414 and 22954 do not undermine its position, DOF cryptically cites to *Board of Administration v. Wilson, supra,* 52 Cal.App.4th at pages 1140–1141 (hereafter *Wilson*), without explaining how *Wilson* supports its position.

---

[4] At the time, section 24415 provided for purchasing power protection at a level of 75 percent of the value of the original allowance. (Stats. 1998, ch. 1006, § 10.) This level was increased to 80 percent in 2001. (Stats. 2001, ch. 840, § 3.)

We presume from the pages cited in *Wilson* that DOF is relying on the following language: "In *Valdes* we said in dictum: 'The current [as of 1983] provisions of the retirement law contain no explicit legislative commitment to an actuarially sound system. However, our review of the present law, its statutory antecedents and the legislative history dispel any doubt that the Legislature intended to create and maintain the PERS on a sound actuarial basis [citations].' (*Valdes* v. *Cory, supra*, 139 Cal.App.3d at pp. 785–786, fn. omitted [finding record inadequate to determine whether disputed provisions in fact impaired actuarial soundness of PERS].) 'If for some lawful reason the existing PERS funds are demonstrably sufficient for actuarial soundness without the state's periodic contribution, the Legislature may forego the contribution without violating the holding in *Valdes* v. *Corey*.' (*Claypool* v. *Wilson* [(1992)] 4 Cal.App.4th [646,] 671 [6 Cal.Rptr.2d 77].)" (*Wilson, supra*, 52 Cal.App.4th at pp. 1140–1141.)

DOF's reliance on the quoted language is misplaced as it is taken out of context. *Wilson*, *Valdes*, and *Claypool* all dealt with the Public Employees' Retirement System (PERS), a defined benefit plan in which funds are deposited into a retirement account and the employee is ensured the payment of a specific sum upon retirement. (*Valdes* v. *Corey, supra*, 139 Cal.App.3d at p. 781 (*Valdes*); *Wilson, supra*, 52 Cal.App.4th at pp. 1118–1119; *Claypool* v. *Wilson, supra*, 4 Cal.App.4th at p. 653 (*Claypool*).) At the time that *Valdes* and *Claypool* were decided, Government Code sections 20751 and 20752 expressly provided for the monthly appropriation of employer contributions to the retirement fund, and Government Code section 20757 declared that such monthly payments are " 'continuing obligations of the State.' "[5] (*Valdes, supra*, 139 Cal.App.3d at p. 787.) Other pertinent Government Code sections provided that the contribution rates could be adjusted, but "manifest[ed] an intent that periodic employer contributions will not be altered absent actuarial input from the board in a timely manner." (*Ibid.*; see, e.g., Gov. Code, former § 20750.9, now *id.*, § 20814.)

According to *Valdes*, "The explicit language in the retirement law constitutes a contractual obligation on the part of the state as employer to abide by its 'continuing obligation' ([Gov. Code,] § 20757) to make the statutorily set payment of monthly contributions to PERS unless and until such time as the board *or* the Legislature, after due consideration of the actuarial recommendations by the board, deems such contributions inappropriate. Absent actuarial input from the board in the manner set forth by Government Code section 20750.9, legislative action randomly and unilaterally cancelling or decreasing otherwise continuously appropriated, periodic employer contributions clearly

---

[5] Government Code sections 20751, 20752 and 20757 were repealed in 1995 (Stats. 1995, ch. 379, § 1, p. 1955), and similar provisions are now found in Government Code sections 20822, 20824 and 20830.

interferes with vested contractual rights of PERS members." (*Valdes, supra,* 139 Cal.App.3d at p. 787; see also *Wilson, supra,* 52 Cal.App.4th at p. 1135 ["state employees under PERS have a contractual right to an actuarially sound retirement system"].)

Thus, *Claypool*'s statement that the Legislature may forgo the state's periodic contribution if the existing PERS funds are demonstrably sufficient for actuarial soundness must be viewed in light of (1) the statutory language governing the PERS system, which permits adjustments to the contribution rates under circumstances related to the actuarial soundness of the system; and (2) the fact that PERS is a defined benefit plan. The language upon which DOF relies simply indicates that if there are sufficient monies in the PERS fund to meet the state's defined benefit payment obligation for the long-term future without undermining the integrity of the system, then the reduction of employer contributions might not impair the state's contractual obligation to make the defined benefit payments. (*Wilson, supra,* 52 Cal.App.4th at p. 1141.)

DOF points to no similar statutory language governing the SBMA permitting the state's contributions to be adjusted based upon the SBMA's actuarial soundness. In contrast to PERS, the SBMA is more akin to a defined contribution plan in which a defined amount is paid into the retirement account, but there is no guarantee that retirees will receive a supplemental payment of a specific amount.

█ Subdivisions (a) and (d) of section 24415 specifically provide that the supplemental payments "shall not exceed the amount necessary to restore purchasing power up to 80 percent of the purchasing power of the initial monthly allowance" and are "payable only to the extent that funds are available from the [SBMA]." In other words, as noted, the state has an express obligation to make an annual contribution of a specified amount into the SBMA to provide a funding stream for the supplemental payments (§ 22954); but it has no obligation to ensure that a fixed supplemental payment is made (§ 24415). This means that the state has no obligation to increase its contribution if the SBMA fund is insufficient to provide the maximum level of supplemental payments because the state is not obligated to provide this level of purchasing power protection. Concomitantly, it cannot forgo or decrease its promised contribution simply because the SBMA fund is actuarially sound for the foreseeable future.

Under the circumstances, DOF fails to demonstrate that the state does not have an express contractual obligation to transfer 2.5 percent of the total creditable compensation into the SBMA without regard for the actuarial soundness of the account.

C

We already have discussed that, without violating the contract clause, the state may pass laws that restrict a party's gains to those reasonably to be expected from the contract. (*Allen v. Board of Administration, supra,* 34 Cal.3d at p. 119; accord, *Wilson, supra,* 52 Cal.App.4th at p. 1130.) DOF contends that the most CalSTRS members could reasonably expect to receive from the benefit provided by section 22415 is 80 percent purchasing power protection, which is not guaranteed. Thus, if the funding provided by the state in Senate Bill 20 (i.e., 2.5 percent of creditable compensation less $500 million for 2003–2004) fully funds the purchasing power protection, then the state has met its obligation.

DOF refuses to accept that Assembly Bill 1102 contained an express contractual promise to provide a specific level of funding into the SBMA annually, from which the supplemental allowances would be paid if sufficient funds were available. There was no promise that sufficient funds would always be available to provide 80 percent purchasing power supplemental payments, only that the state would always transfer the specified amount of money from the General Fund into the SBMA. Consequently, the gain reasonably to be expected is the promised transfer of funds, particularly where the promise was made as part of a negotiated agreement with the Legislature and the Governor, in which CalSTRS agreed to accept a decreased level of funding into the defined benefit program in return. Because section 22954 as enacted by Assembly Bill 1102 "contains a straight-out promise to pay fixed and determinable sums of money," the failure to "fund the system with the installments called for by [the statute], can only be viewed as an impairment of the contract." (*California Teachers Assn. v. Cory, supra,* 155 Cal.App.3d at pp. 508, 510.)

DOF argues that requiring the state to fund the SBMA in an amount greater than necessary to provide 80 percent purchasing power protection would result in an unreasonable windfall and impermissible gift of public funds. It contends that *Lyon v. Flournoy* (1969) 271 Cal.App.2d 774 [76 Cal.Rptr. 869] (hereafter *Lyon*) supports DOF's argument. However, the reliance on *Lyon* is misplaced.

In *Lyon,* a legislator retired in 1955 and began drawing a pension, which, pursuant to Government Code section 9359.1, part of the Legislators' Retirement Law (Gov. Code, § 9350 et seq.), was computed on the basis of a percentage of the salary payable to members of the Legislature "at the time payments of the allowance fall due." Thus, Lyon's retirement benefit would fluctuate with any adjustment in the salaries of incumbent legislators. (*Lyon, supra,* 271 Cal.App.2d at pp. 776–777.) But for more than 10 years, any

fluctuation was theoretical as the salary for members of the Legislature was fixed constitutionally at $500 per month and the voters refused repeatedly to amend the Constitution to increase this amount. (*Id.* at pp. 784–785.)

In 1963, the Legislature adopted Government Code section 9360.9, which provided for the direct adjustment of the retirement allowances of retired legislators based upon increases in the cost of living. (*Lyon, supra,* 271 Cal.App.2d at p. 777.) The intent of the Legislature was to maintain the purchasing power of retirees without having to wait for voters to increase salaries for incumbent legislators. (*Id.* at p. 785.) Although Lyon had retired and died before the enactment of this cost-of-living adjustment, his widow's retirement allowance was increased in accordance with the cost-of-living formula. (*Id.* at pp. 777–778.)

Thereafter, in 1966, the voters approved a constitutional revision, which repealed the $500 per month salary, authorized the Legislature to set its own salaries, and validated a 1966 statute fixing members' salaries at $16,000 per year, beginning with the 1967 term. But the constitutional amendment included a clause prohibiting any member who had retired prior to 1967 from receiving retirement benefits computed on the basis of the new salaries as opposed to the pre-1967 salary of $500 per month. The Legislature incorporated this requirement into the Legislators' Retirement Law. (*Lyon, supra,* 271 Cal.App.2d at p. 778.)

Lyon's widow contended that under the "fluctuation formula" in effect at her husband's retirement, which was based upon the salary of an incumbent legislator, her husband had earned a vested right to the computation of benefits on the basis of the increased salary provided by the 1966 constitutional amendments. (*Lyon, supra,* 271 Cal.App.2d at pp. 778–779.)

The appellate court disagreed, concluding the purpose of the fluctuating pension system was to provide retirees some insulation against normal variations in the cost of living. The substantial increase in salary from $500 per month to $16,000 per year had no relation to this purpose; it was simply the result of long-term legislative frustration over voter resistance to increased salaries. The Legislature had already compensated retirees for the hardship caused by the extended salary freeze via its adoption of the cost-of-living adjustment established in Government Code section 9360.9. Lyon had no reasonable expectation while in office that he would enjoy a double cost-of-living increase, particularly given that his contributions to the retirement fund had been based on his pre-1967 salary. The Legislature properly prevented such a "windfall" by replacing one cost-of-living factor—the fluctuating system of benefit computation based on incumbents' salaries—with another—a formula adjustment based directly on increases in the cost of living. (*Lyon, supra,* 271 Cal.App.2d at pp. 783–786.)

There is no comparable windfall in the present case, which does not concern retirees seeking to benefit from postretirement changes in the way their pension allowance is calculated, which changes result in an unforeseen increase in pension allowances. Assembly Bill 1102 does not change the amount of purchasing power supplemental benefits, or the manner in which they are calculated; it merely secures the funding stream into the SBMA.

■ Nor does our interpretation of Assembly Bill 1102 result in a gift of public funds, which is prohibited by section 6 of article XVI of the California Constitution. "The term 'gift' in the constitutional provision 'includes all appropriations of public money for which there is no authority or enforceable claim,' even if there is a moral or equitable obligation. [Citation.]" (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 450 [123 Cal.Rptr.2d 122].) "[T]he primary question to be considered in determining whether an appropriation of public funds is to be considered a gift is whether the funds are to be used for a public or private purpose. If they are to be used for a public purpose, they are not a gift within the meaning of this constitutional prohibition. [Citation.]" (*California Teachers Assn. v. Board of Trustees* (1978) 82 Cal.App.3d 249, 257 [146 Cal.Rptr. 850]; accord, *Jordan v. Department of Motor Vehicles, supra*, 100 Cal.App.4th at p. 450.)

■ As the trial court correctly ruled, providing CalSTRS members with pension benefits in exchange for accepting and continuing employment in public schools, in accordance with lawful provisions of the Education Code, is not a gift of public funds. However, withholding statutorily mandated sums to fund these benefits is an impairment of contract. (*California Teachers Assn. v. Cory, supra*, 155 Cal.App.3d at pp. 508, 510.)

IV

Next, DOF contends that Senate Bill 20 does not impair contractual rights of CalSTRS members because it gives them a comparable advantage.

■ Public employees have a vested contractual right to pension benefits, but "[n]ot every change in a retirement law constitutes an impairment of the obligations of contracts . . . ." (*Allen v. Board of Administration, supra*, 34 Cal.3d at p. 119.) "As to retired employees, the scope of continuing governmental power may be more restricted, the retiree being entitled to the fulfillment without detrimental modification of the contract which he already has performed." (*Id.* at p. 120.) Prior to retirement, however, " '[a]n employee's vested contractual pension rights may be modified . . . for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable, and it is for the

courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, *and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.*' " (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 864 [148 Cal.Rptr. 158, 582 P.2d 614], original italics; accord, *Wilson, supra,* 52 Cal.App.4th at pp. 1132–1133; *Valdes, supra,* 139 Cal.App.3d at pp. 783–784.)

"The ['material relation'] justification must relate to considerations internal to the pension system, e.g., its preservation or protection or the advancement of the ability of the employer to meet its pension obligations. Changes made to effect economies and save the employer money do 'bear some material relation to the theory of a pension system and its successful operation . . . .' [Citation.] That is not to say that a purpose to save the employer money is a sufficient justification for change. The change must be otherwise lawful and must provide comparable advantages to the employees whose contract rights are modified. . . . [T]he monetary objective will not invalidate a modification which is otherwise valid." (*Claypool, supra,* 4 Cal.App.4th at p. 666; accord, *Wilson, supra,* 52 Cal.App.4th at p. 1137.)

DOF asserts that Senate Bill 20's "deferral of a portion of an annual payment" in amended section 22954 does not impair any vested rights because section 22954.1 authorizes the reimbursement of all or a portion of the withheld $500 million under specified circumstances. According to DOF, this provides CalSTRS members with a comparable advantage. We disagree.

As discussed previously, section 22954.1 provides that every four years an actuarial evaluation shall be made of the anticipated ability of the SBMA to provide purchasing power protection supplemental payments during each fiscal year until June 30, 2036. (§ 22954.1, subd. (a).) If the evaluation discloses that the SBMA funds will be insufficient, then money will be appropriated from the General Fund to cover the shortfall. (§ 22954.1, subd. (b).) "The aggregate amount of funds appropriated pursuant to subdivision (b) is limited to an amount equal to five hundred million dollars ($500,000,000) adjusted by the actual rate of return on funds in the [SBMA] from July 1, 2003, after taking into account any amount previously appropriated pursuant to subdivision (b)." (§ 22954.1, subd. (c).) Section 22954.1 becomes inoperative on July 1, 2036, and is repealed effective January 1, 2037, unless a statute is enacted before January 1, 2037, and deletes or extends the dates on which the statute becomes inoperative and is repealed. (§ 22954.1, subd. (d).)

Section 22954.1 merely substitutes an obligation to make a fixed payment with a conditional promise to make a deferred payment for a limited

period of time. The replacement of an express obligation to pay a fixed sum of money with a promise to pay the sum *if you prove you need it* and, even then, *only if you need it before a specific date*, is not a comparable new advantage.

The time limitation in section 22954.1 is significant because the undisputed facts demonstrate that (1) the state has no obligation to return the $500 million after 2036, at which time the deducted funds will be irretrievably lost, and (2) based on the current rate of return for the SBMA, the loss from the withheld $500 million will be approximately $6.3 billion in the year 2036. This means that if the SBMA funds are sufficient without the $500 million to make the supplemental benefit payments until 2036, then the loss of the principal and growth equivalent to $6.3 billion will become permanent. This is significant because it affects the SBMA's ability to continue to make supplemental benefit payments after 2036. (§ 24415, subd. (b) [excess funds remaining in the SBMA after making the current supplemental benefit payments "shall remain in the [SBMA] for allocation in future years"].)

DOF argues that an actuarial analysis shows that the SBMA is overfunded and is expected to grow over the next 60 years such that in fiscal year 2063–2064, the balance is expected to exceed benefit payments by a five-to-one ratio.[6] It appears DOF believes this indicates that withholding the $500 million does not impair any contractual rights.

The problem with this argument is demonstrated by DOF's use of the term "expected." As DOF's expert, Doug Pryor, stated: "It is not possible at this time to definitively determine whether the SBMA at any time will be unable to fund the purchasing power protection benefit in the future, because that determination would have to take into account the actual rate of inflation that occurs in the future, which cannot be known."

As the trial court astutely observed, "At most, DOF's actuarial analysis shows that the SBMA will never be depleted *if* certain key assumptions are met—i.e., inflation rate, wage growth, mortality, etc. But DOF overlooks that the certainty (or uncertainty) of its projection is as important, or more

---

[6] In a footnote in its opening brief, which is expanded upon in its reply brief, DOF claims the actuarial analysis demonstrates that TRB failed to meet its fiduciary duty to minimize employer contributions to the SBMA. (Cal. Const., art. XVI, § 17, subd. (b).) DOF has forfeited this contention because it was not appropriately raised in its opening brief under a separate argument heading (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4 [41 Cal.Rptr.2d 263]) and because DOF fails to explain how TRB's alleged breach of fiduciary duty justifies the aforementioned impairment of contract such that the trial court erred in granting summary judgment. (*Taylor v. Roseville Toyota, Inc.* (2006) 138 Cal.App.4th 994, 1001, fn. 2 [42 Cal.Rptr.3d 68]; *Marvin Lieblein, Inc. v. Shewry* (2006) 137 Cal.App.4th 700, 708, fn. 2 [40 Cal.Rptr.3d 547].)

important, than the projection itself. In order for DOF's argument to prevail, DOF would have to show not only that . . . its actuary projects the SBMA will be able to fund the purchasing power protection benefit in the future, but also that this projection is certain to come true. The undisputed evidence is to the contrary. [¶] As the evidence shows, the contingencies, and thus the risks associated with the soundness of the SBMA, are numerous and varied. Specifically, such risks include changes in the consumer price index over time, possible future inflation paths, the possibility of changes in the active number of employees, payroll costs increasing by a certain percentage, and annual interest credits."

Therefore, reducing the income stream available to pay the supplemental benefits by $500 million increases the risk to CalSTRS members that the SBMA funds will be insufficient to make the supplemental benefit payments in the future. Senate Bill 20 does not compensate the members for this increased risk or provide a comparable new advantage in place of the $500 million. As a result, Senate Bill 20 impairs the contractual rights bestowed by Assembly Bill 1102 in violation of the state and federal Constitutions.

In DOF's view, only CalSTRS members employed after 1999 have a vested right to the purchasing power protection offered by Assembly Bill 1102's amendment to section 22954, and employees who retired before that date do not have similar vested rights.

CRTA responds that all teachers, even those who retired prior to Assembly Bill 1102, are entitled to its benefits because they are subject to the burden created by Assembly Bill 2804, which was linked to Assembly Bill 1102 and reduced the state's funding of the defined benefit program.

We need not resolve this controversy because even assuming that DOF's position is valid, it fails to provide any analysis explaining how this demonstrates that Senate Bill 20 does not impair the vested contractual rights of CalSTRS members employed at the time of, or after, the passage of Assembly Bill 1102 in 1998. (*Betts v. Board of Administration, supra*, 21 Cal.3d at p. 866 ["[a]n employee's contractual pension expectations are measured by benefits which are in effect not only when employment commences, but which are thereafter conferred during the employee's subsequent tenure"].) Accordingly, the contention requires no further discussion. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [34 Cal.Rptr.2d 558, 882 P.2d 249] [a reviewing court need not discuss claims that are asserted perfunctorily and insufficiently developed].)

## V

DOF contends the trial court erred in determining that the present case is ripe for adjudication. We disagree.

In a declaratory relief action, the question of whether a controversy is ripe for judicial determination is a matter within the discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of that discretion. (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 23 [61 Cal.Rptr. 618].)

"The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306].)

" 'A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.]" (*Pacific Legal Foundation v. California Coastal Com., supra,* 33 Cal.3d at p. 171.) The legal issues posed must be framed with sufficient concreteness and immediacy so that the court can render a conclusive and definitive judgment rather than a purely advisory opinion based on hypothetical facts or speculative future events. (*Id.* at pp. 170–173.) Where doubt exists as to the fitness of the issues for review, account is taken of the public interest in a prompt answer to a particular legal question and the relative hardship on the parties if decision is deferred. (*Id.* at pp. 170, 172–173; see also *California Water & Telephone Co. v. County of Los Angeles, supra,* 253 Cal.App.2d at p. 26.)

DOF argues the controversy is not ripe because (1) section 22954.1 provides a mechanism for repayment of the withheld funds, and (2) the diversion of the funds will not upset the reasonable expectations of CalSTRS members to receive supplemental benefit payments since adequate funds are available for the next 33 years. Thus, DOF asserts, it is speculative whether the diversion of the $500 million will ever have a negative effect. DOF relies on *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110 [109

Cal.Rptr. 799, 514 P.2d 111] (hereafter *Selby*) for the proposition that courts should not decide disputes based on speculative events.

In *Selby*, a county adopted a general plan designating a street to be built across certain property. The owner of the property sought a declaration that the adoption of the plan, without more, constituted a taking of his property without due process of law. (*Selby, supra*, 10 Cal.3d at pp. 115–117.) *Selby* held that the owner could not maintain an action for declaratory relief against the county based solely upon the adoption of a general plan showing a street to be located on his land. He had to await implementation of the plan through the institution of condemnation proceedings against him. (*Id.* at pp. 117–118.)

*Selby* emphasized that the challenged plan had not been implemented at all: "The plan is by its very nature merely tentative and subject to change. Whether eventually any part of plaintiff's land will be taken for a street depends upon unpredictable future events. If the plan is implemented by the county in the future in such manner as actually to affect plaintiff's free use of his property, the validity of the county's action may be challenged at that time." (*Selby, supra*, 10 Cal.3d at p. 118.) In other words, the plaintiff could not allege any direct and immediate effects on the use of his land arising from the mere adoption of the general plan; he was simply anticipating that the plan would someday be implemented at his expense.

*Selby* is inapposite. Here, the diversion of $500 million from the SBMA and the concomitant impairment of the contract rights of CalSTRS members is not tentative or speculative; it is the reimbursement of this money or the mitigation of the impairment that is speculative. It is unreasonable for DOF to use the illusory, contingent, and time-limited promise of repayment set forth in section 22954.1 to claim the controversy is not ripe. Under DOF's theory, the plaintiff in *Selby* would not present a justiciable controversy if the county used its eminent domain powers to condemn the plaintiff's land for less than just compensation, but gave a speculative promise that it might pay the full compensation owed at some time within the next 33 years, under specified circumstances that were not certain to occur and were dependent upon the plaintiff's financial need.

The trial court did not abuse its discretion in finding the controversy was ripe.

## VI

In its cross-appeal, TRB argues the trial court erred in failing to adjudicate TRB's claim that Senate Bill 20 interferes with its plenary authority in violation of article XVI, section 17 of the California Constitution, which was

amended by Proposition 162 in part as follows: "Notwithstanding any other provisions of law or this Constitution to the contrary, the retirement board of a public pension or retirement system shall have plenary authority and fiduciary responsibility for investment of moneys and administration of the system, subject to all of the following: [¶] (a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries. The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system."

The thrust of the arguments in favor of Proposition 162 concerned preventing the Legislature from "raiding" pension funds. (*Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095, 1111 [130 Cal.Rptr.2d 149].) In fact, Proposition 162 contains an express declaration that its purpose is " '[t]o protect pension funds so that retirees and employees will continue to be able to enjoy a basic level of dignity and security in their retirement years,' " and " '[t]o ensure that the assets of public pension systems are used exclusively for the purpose of efficiently and promptly providing benefits and services to participants of these systems, and not for other purposes.' " (Historical Notes, 3 West's Ann. Const. (1996 ed.) foll. art. 16, § 17, p. 114.)

In the trial court, as on appeal, TRB argued that Senate Bill 20 violated article XVI of the California Constitution by taking $500 million from the appropriation belonging to the SBMA and by using it to balance the budget.[7] It also asserted that the contingent repayment plan adopted by Senate Bill 20 violated its plenary authority to administer the SBMA, because it gave DOF ultimate control over the entitlement to reimbursement since it could refuse to certify the actuarial analysis presented by TRB in support of reimbursement. The trial court declined to address the validity of this claim because the resolution of the contract clause issue in TRB's favor made it unnecessary to address TRB's alternate constitutional challenge.

---

[7] In signing Senate Bill 20, Governor Davis issued the following message: " 'To the Members of the California Legislature: [¶] I am signing Senate Bill 20x because it is an important step toward balancing the state budget. It is part of a bipartisan package of six bills that taken together is intended to achieve a critical $3.6 billion in budget reductions for the 2002–03 and 2003–04 fiscal years. [¶] As part of the state's cost savings measures, Senate Bill 20x foregoes [*sic*] a one-time $500 million General Fund contribution in 2003–04 to the Supplemental Benefit Maintenance Account . . . within the California State Teachers' Retirement System . . . .' " (Historical and Statutory Notes, 26E West's Ann. Ed. Code. (2007 supp.) foll. § 22954, p. 19.)

Contending the trial court erred in failing to adjudicate TRB's article XVI claim, TRB urges us to address and resolve the issue as a matter of law. It acknowledges that the resolution of the contract clause issue in its favor results in the reimbursement of the purloined $500 million, but claims that this does not afford it complete relief because it does not address the Legislature's attempt to usurp TRB's authority. TRB argues it is entitled to "a judicial declaration defining the contours of its 'plenary authority' to administer the CalSTRS system" and "defin[ing] the extent to which the Legislature may, if at all, legislate in this area after voter approval of Proposition 162." We are not persuaded.

 A fundamental principle of constitutional adjudication is that a court will not decide constitutional questions unless absolutely required to do so to dispose of the matter before the court, which means we will not reach constitutional questions where other grounds are available and dispositive of the issues of the case. (*Lyng v. Northwest Indian Cemetery Prot. Assn.* (1988) 485 U.S. 439, 445 [99 L.Ed.2d 534, 544, 108 S.Ct. 1319]; *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230–231 [45 Cal.Rptr.2d 207, 902 P.2d 225]; *Matrixx Initiatives, Inc. v. Doe* (2006) 138 Cal.App.4th 872, 881 [42 Cal.Rptr.3d 79].)

Our resolution of TRB's contract clause challenge results in the unconditional return of the $500 million to the SBMA, which nullifies the portion of Senate Bill 20 (i.e., § 22954.1) concerning the procedure that the Legislature dictated must be followed to obtain return of the funds by July 2036. Because the Legislature had no right to withhold the funds, TRB is not required to jump through the hoops set up by section 22954.1 for the return of the $500 million. Under the circumstances, we do not consider whether section 22954.1 violated TRB's plenary authority under article XVI of the California Constitution.

As for TRB's request that we issue a judicial declaration defining (1) the contours of TRB's plenary authority to administer the CalSTRS system, and (2) the extent to which the Legislature may legislate in this area after voter approval of Proposition 162, this is nothing more than a request for an advisory opinion. TRB is concerned that the Legislature will continue to "put its hands back in 'the till' of retired public employees' monies" and continue to enact legislation that interferes with TRB's administration of CalSTRS. But "[c]ourts simply may not render advisory opinions on controversies which the parties fear will arise, but which do not presently exist." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 78 [24 Cal.Rptr.3d 72]; see also *Sanctity of Human Life Network v. California Highway Patrol* (2003) 105 Cal.App.4th 858, 872 [129 Cal.Rptr.2d 708].) "This policy is driven largely by a recognition that courts are unable properly to adjudicate issues

when only hypothetical facts are involved." (*City of Santa Monica v. Stewart, supra*, 126 Cal.App.4th at p. 70, fn. omitted.)

Accordingly, we decline to issue an advisory opinion to forestall hypothetical events that may never occur.

## VII

The trial court awarded prejudgment and postjudgment interest at a rate of 7 percent per annum.

CRTA and TRB do not dispute the award of postjudgment interest. They contend only that they are entitled to prejudgment interest on the damages awarded at a rate of 10 percent per annum, pursuant to Civil Code sections 3287 and 3289.

DOF responds that because Civil Code section 3289 does not expressly provide that it is applicable to the state, CRTA and TRB are entitled only to 7 percent interest under the California Constitution.

Article XV, section 1 of the California Constitution provides: "The rate of interest upon a judgment rendered in any court of this State shall be set by the Legislature at not more than 10 percent per annum. Such rate may be variable and based upon interest rates charged by federal agencies or economic indicators, or both. [¶] In the absence of the setting of such rate by the Legislature, the rate of interest on any judgment rendered in any court of the State shall be 7 percent per annum."

Prejudgment interest is governed by Civil Code section 3287, which states in pertinent part: "(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or . . . public agency, or any political subdivision of the state. [¶] (b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim

was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

Civil Code section 3289 specifies the rate of prejudgment interest in contract cases as follows, in pertinent part: "(b) If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

Thus, subdivision (a) of Civil Code section 3287 authorizes prejudgment interest on liquidated damages, and it is explicitly applicable to public entities. Subdivision (b) of the statute provides for prejudgment interest on contract claims that are unliquidated. Although subdivision (b) does not repeat the language of subdivision (a), indicating express application to public entities, it applies to public entities in the same manner. (*Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 71–73 [108 Cal.Rptr.2d 715].) Hence, whether a contract claim is liquidated or unliquidated, prejudgment interest may be recovered from a state or public entity.

Civil Code section 3289 specifies that the applicable interest rate for prejudgment interest in breach of contract cases is 10 percent. This rate, set by the Legislature, from which public entities are not excepted, replaces the default rate in the California Constitution for instances in which the Legislature has not acted to set another rate. Having made state and public entities liable for prejudgment interest on all contract claims, whether liquidated or unliquidated, the interest rate set forth for such claims in Civil Code section 3289 necessarily applies to these entities absent an express legislative exemption.

Here, the state entered into a contractually enforceable promise to transfer a specified percentage of funds into the SBMA; the state breached this contract by diverting $500 million of the promised funds; and the contract "does not stipulate a legal rate of interest" within the meaning of subdivision (b) of Civil Code section 3289. Accordingly, petitioners are entitled to prejudgment interest at a rate of 10 percent per annum.

## DISPOSITION

The judgment is modified to increase the rate of prejudgment interest to 10 percent per annum. As so modified, the judgment is affirmed. DOF shall reimburse respondents and cross-appellants for their costs on appeal. (Cal. Rules of Court, rule 8.276.)

Blease, J., and Hull, J., concurred.

The petition of appellant Michael C. Genest for review by the Supreme Court was denied November 14, 2007, S157055.