Filed 2/6/15  Roe v. State Personnel Board CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ROBERT ROE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>STATE PERSONNEL BOARD,<br><br>        Defendant;<br><br>DEPARTMENT OF JUSTICE,<br><br>        Real Party in Interest and Appellant. | A138201<br><br>(Alameda County<br>Super. Ct. No. C-820295) |

In 1992, Robert Roe was dismissed by the California Department of Justice (Department) from his position as a deputy attorney general.  Roe's dismissal was ultimately upheld by the State Personnel Board (Board).  In the 22 years since Roe's dismissal, this case has been before this court on multiple occasions.  (See *Roe v. State Personnel Bd.* (Jan. 15, 1998, A075617) [nonpub. opn.] (*Roe I*); *Roe v. State Personnel Bd.* (Aug. 16, 2000, A086674) [nonpub. opn.] (*Roe II*); *Roe v. State Personnel Bd.* (2004) 120 Cal.App.4th 1029 (*Roe III*); *Roe v. State Personnel Bd.* (Jan. 30, 2007, A112383) [nonpub. opn.] (*Roe IV*); *Roe v. Department of Justice* (Sept. 21, 2007, A114241) [nonpub. opn.] (*Roe V*).)  The current dispute is over calculation of backpay due to Roe and the amount of prejudgment interest to be paid on the award.

In *Roe III,* we determined that Roe was terminated without being afforded pretermination due process rights and was therefore entitled to backpay for the period between September 24, 1992, and May 5, 1999.  (*Roe III*, *supra*, 120 Cal.App.4th at

1

pp. 1032–1033.) The Board awarded backpay, as well as prejudgment interest and benefits, offset with the amount Roe had earned from substitute employment. Both the Department and Roe filed petitions for administrative mandamus challenging aspects of the remedy imposed, which the superior court granted in part. The Department appeals from that judgment, challenging the rate of prejudgment interest applied by the trial court to the backpay award. Roe cross-appeals, contending that the amount of backpay awarded was insufficient. We agree with the Department that the rate of interest should not exceed 7 percent. Accordingly, we reverse the judgment for recalculation of interest, but affirm it in all other respects.

## I.    LEGAL BACKGROUND

"The interest of a permanent or tenured civil servant in the continuation of his or her employment is a vested property interest qualifying for protection under the Constitution's due process guarantee." (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1109, citing *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206 (*Skelly*).) "In [*Skelly*], the Supreme Court, while acknowledging that a permanent civil service employee has a statutory right to an evidentiary hearing after his dismissal to challenge the action taken against him, held that due process of law also requires that such an employee have certain rights *prior* to the effective date of the dismissal." (*Kirkpatrick v. Civil Service Com.* (1978) 77 Cal.App.3d 940, 945, italics omitted.) " 'The minimal due process rights required by *Skelly* prior to discharge are merely anticipatory of the full rights which are accorded to the employee after discharge. The employee can exercise those rights at the subsequent hearing, and if that hearing shows that there were good grounds for dismissal, the employee is not entitled to reinstatement; he is merely entitled to damages for the limited time period in which discipline was wrongfully imposed, i.e. , the employee is entitled to back pay for the period from the time discipline was actually imposed to the date the commission filed its decision validating the dismissal. [Citations.]' [Citation.]" (*Williams v. City of Los Angeles* (1990) 220 Cal.App.3d. 1212, 1217, italics omitted.)

2

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Many of the underlying facts are set out in detail in *Roe III, supra,* 120 Cal.App.4th 1029.  We repeat the salient facts.

On August 25, 1992, the Department mailed Roe a notice of adverse action dismissing him for cause from his position as a deputy attorney general effective August 31, 1992.  The Department charged Roe with dishonesty, willful disobedience, misuse of state property, and general failure of qualifications and good behavior.  The charges stemmed from Roe's alleged unauthorized removal of two computer printers from the offices of the Attorney General.

On August 31, 1992, Roe's counsel, Roger Patton, met with Assistant Attorney General George Williamson, the Department *Skelly* officer,[1] and proposed various resolutions short of dismissal; he told Williamson that the Department had not given Roe adequate notice of termination.  Patton and Williamson scheduled the *Skelly* hearing for September 24 at 2:00 p.m.  Patton testified that Williamson warned him on September 23 that for Roe to avoid discipline he would have to submit his resignation by the 24th.

On September 24, 1992, at 11:14 a.m., about three hours before the scheduled *Skelly* hearing, Patton faxed Williamson a letter of resignation signed by Roe, which stated "I hereby resign from my position as a deputy attorney general effective today at 5:00 p.m."  Patton's cover letter stated in part, "Enclosed is [Roe's] letter of resignation from his position as Deputy Attorney General.  Our understanding is that this terminates the employment relationship and any pending disciplinary proceeding.  [Citation.]"  The Department never responded.  In November, when Roe asked his union representative to inquire about his backpay and benefits, he learned for the first time that the Department took the position that he was terminated on August 31, 1992.

---

[1] The term refers to the individual authorized to hear the response of a permanent employee to proposed adverse employment action, pursuant to *Skelly, supra,* 15 Cal.3d 194.

*Board Proceedings*

On December 23, 1992, the Department filed an amended notice of adverse action with the Board, changing the effective date of the adverse action from August 31 to September 24, 1992. Roe's answer asserted that he resigned September 24 pursuant to an agreement with the Department. In response, the Department tried to withdraw its amended notice, on the new theory that the Board was without jurisdiction because Roe's termination had actually become final on September 14, 20 days after service of the original notice.[2] The Board adopted the proposed decision of the administrative law judge (ALJ), which concluded that the Board did not have jurisdiction to consider the matter because Roe had not timely appealed his termination.

*Roe I and II*

In his first writ proceeding, Roe petitioned for a writ of mandate directing the Department to vacate the August 31, 1992 dismissal and reinstate him. The superior court granted the petition, finding that the Board erred in denying jurisdiction and Roe had been terminated without due process. On appeal of that decision (*Roe I*), this court affirmed the superior court's conclusion that the Board had jurisdiction to decide Roe's appeal on the merits. However, we also concluded that the superior court erred by deciding the question of whether Roe was denied pretermination due process instead of remanding to the Board for further proceedings. We directed the superior court to enter a new judgment granting the petition for writ of mandate and remanding the matter to the Board with instructions to hear Roe's appeal. In *Roe II*, this court held that Roe was entitled to attorney fees and costs under 42 United States Code section 1983 for litigating the *Roe I* mandamus proceeding.

*Roe III and IV*

On remand, an ALJ for the Board conducted hearings and admitted evidence regarding the underlying claims of misconduct, Roe's termination, and subsequent

---

[2] Under the version of Government Code section 19575 then in effect, Roe had 20 days from service of the notice to file an answer with the Board.

events. The ALJ found that the August 31, 1992 termination was invalid because Roe was not provided adequate notice and that Roe resigned effective September 24. On May 5, 1999, the Board adopted the ALJ's proposed decision awarding Roe backpay, with interest and benefits, for the period September 1 through 24, 1992.

Roe filed a second petition for writ of mandate challenging the finding that he resigned effective September 24, 1992, and the resulting award of limited backpay. The superior court granted the petition, rejecting the Board's conclusion that Roe's resignation was effective, reasoning that the Department itself maintained the position that Roe had been terminated on August 31.

In *Roe III*, we affirmed the superior court decision that the Board erred in determining that Roe resigned effective September 24, 1992, and in limiting Roe's backpay award accordingly. We held that Roe was terminated without due process and he was entitled to backpay for the period September 1, 1992, through May 5, 1999, the date of the Board's decision after hearings on the merits of the charges against Roe. We directed the superior court to enter a new judgment granting the petition for writ of mandate and ordered a remand to the Board for determination of the amount of backpay due. Furthermore, the Board was directed to make a finding regarding whether Roe's dismissal was for good cause.

In May 2005, Roe moved for attorney fees for the second writ of mandate proceeding culminating in *Roe III*. The superior court denied the motion and in *Roe IV* we reversed, concluding that the second writ of mandate proceeding was within the scope of 42 United States Code section 1983 and that Roe was entitled to an attorney fee award.

*Roe V*

On remand from *Roe III*, the superior court issued a peremptory writ of mandate to the Board. The writ commanded the Board to vacate its previous backpay award, determine the amount of backpay due for the period September 1, 1992 through May 5, 1999, and make a finding whether Roe's dismissal was for good cause.

On March 18, 2005, Roe filed his third petition for writ of mandate, alleging that the Board had not complied with time limits in Government Code section 18671.1. Roe

5

further alleged there was no good cause for dismissal, he was suffering ongoing wrongful deprivation of employment because the Board's conclusion that he had resigned had been overturned in *Roe III*, and the extended delay in obtaining a decision on the merits constituted a deprivation of due process.

In April 2005, the Board issued a decision sustaining Roe's dismissal. The Board adopted the ALJ's findings, who found that Roe's "conduct was dishonest, and constituted a misuse of state property, and other failure of good behavior, in violation of Government Code section 19572, subdivisions (f), (p), and (t)." The penalty of dismissal was upheld because Roe's "course of deceitful conduct was continuing in nature rather than an isolated incident."[3] The superior court denied Roe's petition for writ of mandate, concluding that the time limits in Government Code section 18671.1 were inapplicable.

On appeal, we affirmed the superior court's determination that the time limits in Government Code section 18671.1 were inapplicable. We also held that Roe was not entitled to seek de novo judicial review by petition for writ of mandate under Code of Civil Procedure section 1085. We also rejected Roe's argument that he was entitled to backpay after May 1999 or reinstatement. We explained, "Roe has already been awarded backpay for the *Skelly* violation, and there has been no administrative or judicial finding that the Department was unjustified in terminating him. Because there is no determination in Roe's favor on that issue, there is no 'ongoing wrongful deprivation.' " (*Roe V., supra,* A114241.)

*Events Leading to the Present Appeals*

While *Roe V* was pending, the Board conducted further proceedings to determine the amount of backpay due Roe. In its decision dated October 31, 2006 (October 2006 Decision) the Board said: "[A]s a result of the *Skelly* violation, [Roe] was reinstated to

---

[3] Although not in the record before us, we take judicial notice that, in 2006, Roe filed a petition for a writ of mandate in the superior court challenging the Board's decision on the dismissal. That writ proceeding was assigned case No. RG06-289531. The superior court ultimately dismissed that petition with prejudice, pursuant to Roe's request.

his position as a Deputy Attorney General IV from September 1, 1992, through May 5, 1999, and [his] dismissal did not become effective until the close of business on May 5, 1999. [Roe], therefore, must be considered to have been a Department employee during that time period; with all the benefits and liabilities that attach to that status." Accordingly, the Board awarded backpay comprised of the salary, health benefits, vacation, and sick leave Roe would have earned from the Department between September 1, 1992 and May 5, 1999, plus interest, "less any salary earned by [Roe] during the relevant time period." Roe was awarded salary less mitigation in an amount totaling $170,338.85. The Board did not determine the amounts to be awarded for unused vacation and holidays.

In reaching such an award, the Board also made several additional findings and conclusions: (1) The Department paid Roe his monthly salary ($7,124) for September 1992, although "such payment was not given to him until 1993"; (2) The scope of the backpay remedy was not governed by Government Code section 19584; (3) The appropriate prejudgment interest rate to be applied was 7 percent; (4) Roe was entitled to CalPERS retirement benefits and enrollment in CalPERS retiree health, dental, and vision programs; (5) Roe was entitled to "be compensated for any loss he incurred as a result of having been stripped of [medical, dental, and vision insurance] benefits between September 1, 1992 and May 5, 1999," including "out of pocket medical expenses that he would not have incurred had he been insured under the PERS health, dental and/or vision insurance plan(s) he was enrolled in on August 31, 199[2]."[4] Finally, the Board rejected Roe's claim that certain income he earned between 1992 and 1995 should be characterized as "moonlighting income" and not offset backpay.

---

[4] Because neither Roe nor the Department submitted sufficient information, the Board ordered the case remanded to the ALJ "with instructions to conduct a hearing on the issue of whether, *during the backpay period*, [Roe] purchased substitute insurance coverage or incurred, insured or uninsured, out of pocket medical expenses that he would not have incurred had he been insured under the PERS health, dental and/or vision insurance plan(s) he was enrolled in on August 31, 199[2]." (Italics added.)

7

On March 19, 2007, Roe filed a supplemental petition for writ of mandate, pursuant to Code of Civil Procedure section 1094.5, challenging the October 2006 Decision on backpay, including the interest rate determination. The supplemental petition was filed as a motion under case No. C-820295, the superior court case that was the subject of *Roe III*.[5] (See *Roe III, supra*, 120 Cal.App.4th 1029.) The Department filed a cross-petition, challenging only the Board's ruling with respect to vacation.

In January 2008, the Honorable Frank Roesch granted Roe's petition in part and issued a "Supplemental Writ of Administrative Mandate" (2008 Writ of Mandate) directing the Board to conduct further proceedings. Specifically, Judge Roesch found the Board abused its discretion in determining the applicable interest rate. Judge Roesch also concluded Roe's business earnings for independent appellate work were to be considered as part of the mitigation offset; the Board did not abuse its discretion in determining that Government Code section 19584 was not applicable; and the Board's finding on Roe's 1995 mitigation earnings was supported by substantial evidence.

The 2008 Writ of Mandate directed the Board to reconsider its backpay decision. Specifically, the Board was directed to (1) reconsider evidence regarding whether Roe received payment for his September 1992 salary as "it appears that the evidence cited does not lead to the conclusion reached by the [Board]"; (2) reconsider mitigation adjustments for Roe's self-employment taxes; (3) apply 10 percent prejudgment interest pursuant to Civil Code section 3289, subdivision (b); (4) calculate amounts due Roe for vacation credits, personal holiday credits, weekend holiday credits, and sick leave credits he would have accrued during the backpay period; (5) determine whether awarding compensation for medical expenses that would have been covered by PERS retiree plans, but were incurred by Roe outside the backpay period, "in addition to the amounts incurred between [September 1, 1992 and May 5, 1999,] is more consistent with the

_____

[5] In 2007, the superior court consolidated case Nos. RG06-289531 and C-820295 "for all purposes."

8

principle of awarding Roe appropriate compensation for the period in which he was denied his *Skelly* rights."

The Department filed a notice of appeal, contesting only the superior court's interest rate ruling. Roe filed a cross appeal. Because the writ proceedings in case No. RG06-289531 remained pending before the superior court, we dismissed the appeals as premature.

*The Board's Second Backpay Decision*

Upon remand, the Board received further briefing and evidence of additional health expenses incurred by Roe after May 1999. In its decision dated December 13, 2011 (December 2011 Decision), the Board concluded that "[Roe] has not provided persuasive authority to change the prior determinations that he is not entitled to health-related costs beyond May 5, 1999." The Board also concluded Roe was entitled to approximately $22,050 plus 10 percent interest per annum for health-related expenses incurred during the backpay period; the Board's finding that the Department compensated Roe for September of 1992 was substantiated; and Roe was entitled to an additional 14 hours of vacation credits (from September 1992) for a total of $646.46 plus 10 percent interest per annum.

*The Superior Court's Final Backpay Ruling*

Roe filed another supplemental petition for writ of mandate, pursuant to Code of Civil Procedure section 1094.5, challenging the December 2011 Decision. Again, the supplemental petition was filed as a motion under case No. C-820295. The Department again filed a cross-petition.

In November 2012, the Honorable Lawrence John Appel issued an order granting both Roe's and the Department's petitions in part. As relevant here, Judge Appel determined: (1) Recalculation of accrued interest pursuant to Code of Civil Procedure section 695.220 was not required; (2) The Board complied with the 2008 Writ of Mandate by considering whether it should award additional health benefits beyond May 5, 1999; (3) Roe was entitled to the sum that the Department would have paid for his health, dental, and vision premiums had Roe remained employed during the backpay

9

period; (4) The Board "committed no error" in not adjusting mitigation offsets for moonlighting income; (5) The Board's findings regarding payment of Roe's September 1992 salary were supported by substantial evidence. To avoid an additional remand to the Board, the parties agreed that the necessary recalculations would be performed by their economic consultants and submitted to Judge Appel for approval.

After the parties submitted their competing calculations, Judge Appel entered the final order granting both Roe's and the Department's petitions in part. Judge Appel further determined that with interest at the rate of 10 percent calculated through January 31, 2013, Roe was entitled to $61,755.68 to compensate for health insurance contributions the Department would have paid on his behalf during the backpay period; $14,007.11 in additional backpay to compensate for amounts Roe paid in self-employment taxes in 1993, 1994 and 1998; and $21,962.97 for additional vacation benefits. Judgment was entered on February 1, 2013, ordering the Department to pay Roe an additional $97,725.76. The Department and Roe each filed timely notices of appeal from the judgment.

## III.  DISCUSSION

On appeal the Department challenges the rate of prejudgment interest awarded. In his cross-appeal, Roe contends that backpay was erroneously limited. Specifically, he asserts that (1) substantial evidence does not support the Board's finding that he was paid his September 1992 salary; (2) the Board deducted excess mitigation earnings; (3) the Board erroneously refused to order reimbursement of out-of-pocket health expenses, incurred between May 5, 1999 and 2007, that would have been covered by retirement health benefits; and (4) interest was erroneously calculated. Only the Department's argument has merit.[6]

---

[6] We do not address any arguments raised solely in footnotes or without a discrete section heading, such as the Department's contention that it overpaid Roe with respect to mitigation adjustments for self-employment taxes. (See *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 160; *Roberts v. Lomanto* (2003) 112 Cal.App.4th 1553, 1562.) In his cross-appeal, Roe asserts a related argument that the Department, in fact, underpaid interest on mitigation adjustments for self-employment

10

A.      *Standard of Review*

The Board is an administrative agency with adjudicatory powers, pursuant to the California Constitution.  (Cal. Const., art. VII, §§ 2, 3.)  When the Board reviews disciplinary actions, it acts "much as a trial court would in an ordinary judicial proceeding. . . . [It] makes factual findings and exercises discretion on matters within its jurisdiction . . . [and] [o]n review the decisions of the Board are entitled to judicial deference."  (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 823.)  If an employee challenges the Board's decision by filing a petition for writ of administrative mandate, the superior court must defer to the Board's factual findings if they are supported by substantial evidence.  (Code Civ. Proc., § 1094.5, subd. (c); *State Personnel Bd. v. Dept. of Personnel Admin.* (2005) 37 Cal.4th 512, 522; *Skelly, supra,* 15 Cal.3d at p. 217, fn. 31.)  "The review is to be limited to considerations of whether the board exceeded its jurisdiction, committed errors of law, abused its discretion, or made findings unsupported by substantial evidence.  [Citations.]" (*Wilson v. State Personnel Bd., supra,* 58 Cal.App.3d at p. 870.)

On appeal from the superior court's judgment, an appellate court is not bound by the superior court's determinations.  We review the Board's decision, applying the same standard of review the superior court applied.  (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584 (*Youth Authority*); *Flowers v. State Personnel Bd.* (1985) 174 Cal.App.3d 753, 758; *Wilson v. State Personnel Bd., supra,* 58 Cal.App.3d at p. 870.)  Accordingly, we too must accept the Board's factual findings if supported by substantial evidence.  (*Valenzuela v. State Personnel Bd.* (2007)

---

taxes.  Roe concedes that the superior court remedied the error with respect to self-employment taxes paid in 1993, 1994, and 1998.  However, Roe now challenges, for the first time, the interest calculations for 1996, 1997, and 1999 self-employment tax adjustments.  The argument was not raised below and was forfeited.  (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 ["arguments not asserted below are waived and will not be considered for the first time on appeal"]; *Wilson v. State Personnel Bd.* (1976) 58 Cal.App.3d 865, 883.)

11

153 Cal.App.4th 1179, 1184; *Department of Parks & Recreation v. State Personnel Bd.,* *supra*, 233 Cal.App.3d at p. 823.)

"When the standard of review is the substantial evidence test, . . . it is presumed that the findings and actions of the administrative agency were supported by substantial evidence. [Citations.]" (*Desmond* v. *County of Contra Costa* (1993) 21 Cal.App.4th 330, 335–336.) We do not reweigh the evidence. (*Youth Authority, supra,* 104 Cal.App.4th at p. 584; *Camarena v. State Personnel Bd.* (1997) 54 Cal.App.4th 698, 701.) Instead, we review all the evidence, including that which detracts from the evidence supporting the Board's determination, but accept all reasonable inferences favorable to the Board. (*Youth Authority,* at pp. 584, 586; *Valenzuela v. State Personnel Bd., supra,* 153 Cal.App.4th at p. 1184; *Department of Parks & Recreation v. State Personnel Bd., supra,* 233 Cal.App.3d at p. 823; *Camarena,* at p. 701.) Substantial evidence is relevant, reasonable, and credible evidence that a reasonable person might accept as adequate to support a conclusion. (*Youth Authority,* at pp. 584–585.)

On questions of law, we exercise independent judgment. (Code Civ. Proc., § 1094.5, subd. (b); *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.) The Board's interpretation of governing statutes is entitled to great weight and respect even if not necessarily to deference. (*California Dept. of Corrections v. State Personnel Bd.* (2004) 121 Cal.App.4th 1601, 1611.)

B.      *Interest Rate*

What prejudgment interest rate applies to the Board's *Skelly* backpay award? Is the applicable interest rate 7 percent as set forth in article XV, section 1 of the California Constitution, or is it 10 percent as set forth in Civil Code section 3289, subdivision (b)? The question has not been addressed by a California court in any published decision. We apply our independent judgment and conclude that the applicable rate of prejudgment interest is 7 percent.

Roe is undisputedly entitled to prejudgment interest on his backpay award. "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is

12

entitled also to recover interest thereon from that day . . . . This section is applicable to recovery of damages and interest from any debtor, *including the state* . . . ." (Civ. Code, § 3287, subd. (a), italics added.)[7] "Backpay awarded by an administrative agency . . . may be considered damages for purposes of Civil Code section 3287's mandate of interest." (*Currie v. Workers' Comp. Appeals Bd.* (2001) 24 Cal.4th 1109, 1116 (*Currie*).) "Interest is recoverable on each salary . . . payment from the date it fell due. [Citation.]" (*Olson v. Cory* (1983) 35 Cal.3d 390, 402.)

"[T]he California Constitution provides for prejudgment interest at 7 percent per annum. (Cal. Const., art. XV, § 1.) However, Civil Code section 3289 provides that the legal rate of interest chargeable after breach of a contract which does not stipulate an interest rate is 10 percent per annum." (*Pro Value Properties, Inc. v. Quality Loan Service Corp.* (2009) 170 Cal.App.4th 579, 582–583; accord, *Children's Hospital & Medical Center v. Bonta'* (2002) 97 Cal.App.4th 740, 774–775.) The Department asks us to reverse the judgment insofar as it includes interest in excess of 7 percent. It maintains that the applicable rate is 7 percent because Roe's *Skelly* remedy was based on the Department's failure to provide adequate pretermination due process, not breach of contract. Roe, on the other hand, contends that the 10 percent rate applies "[b]ecause backpay is salary and benefits under the employment contract, it is subject to the statutory rate for contract obligations."

The superior court, and the Board in its December 2011 Decision, applied the 10 percent interest rate specified in Civil Code section 3289, subdivision (b). The superior court reasoned that Civil Code section 3289, subdivision (b), applies to the *Skelly* backpay remedy because it restored Roe's salary and benefits, which are governed

---

[7] In arguing that 7 percent is the applicable rate of *prejudgment* interest, the Department misplaces its reliance on several cases involving *postjudgment* interest. (See, e.g., *311 South Spring Street Co. v. Department of General Services* (2009) 178 Cal.App.4th 1009, 1013, fn. 1 ["the 10 percent rate for *postjudgment* interest set out in Code of Civil Procedure section 685.010 does not apply to the State" (italics added)]; *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 352; *Gregory v. State Bd. of Control* (1999) 73 Cal.App.4th 584, 599.)

by a collective-bargaining agreement.  In the 2008 Writ of Mandate, Judge Roesch wrote: "Although as a general matter, public employment is held by statute rather than by contract (see, e.g., *Kim v. Regents of* [*University*] *of California* (2000) 80 Cal.App.4th 160, 164), it is undisputed that Roe's terms and conditions of employment were also governed by a memorandum of understanding . . . which the [Board] recognizes is 'a contract with the state employer.'  [Citation.]  In such circumstances, a remedy for restoration of salary and benefits in accordance with that [memorandum of understanding] falls within Civil Code section 3289[, subdivision] (b), specifying prejudgment interest of 10 percent per annum based on an obligation under a 'contract entered into after January 1, 1986' not stipulating a legal rate of interest.  (Cf. *Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1045 [(*Genest*)] [finding that [Civ. Code, § 3289] applied to order to transfer funds into the Teachers' Retirement Fund pursuant to statute specifying that such right was in the nature of a contractually enforceable promise]; *Fugitt v. City of Placentia* (1977) 70 Cal.App.3d 868, 876 [(*Fugitt*)] [stating that private and public employees are entitled to contract damages for wrongful discharge, citing [Civ. Code,] § 3300 applicable to a 'breach of an obligation arising from contract']; *Harris v. State* [*Personnel*] *Bd.* (1985) 170 Cal.App.3d 639, 643 [(*Harris*)] [claim for backpay by public employee was 'for wages he alleges are owed to him by his employer arising out of his contract for employment,' which fell within the Torts Claim Act exception for actions arising on contract.])"

        We begin with Civil Code section 3289, which provides:  "(a) Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation. [¶] (b) If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum *after a breach*. [¶] For the purposes of this subdivision, the term contract shall not include a note secured by a deed of trust on real property." (Italics added.)  Roe insists that "[t]he contractual nature of withheld salary and benefits is beyond dispute" and that Civil Code section 3289, subdivision (b), does not apply only to breach of contract causes of action.  Roe's argument overlooks the

14

plain language of the statute.  Civil Code section 3289, subdivision (b), makes no mention of awarding 10 percent interest whenever a remedy resembles contract damages.  Instead, the plain language makes clear that the 10 percent interest rate applies only after *breach* of contract.  This is not a breach of contract case.  (*Roe III, supra*, 120 Cal.App.4th at pp. 1032–1033.)

Recognizing as much, Roe attempts to reframe this long-winding litigation as two separate actions.  He insists, "The due process violation was established on remand from the writ in 750385-6.  The current action (C-820295) seeks salary and benefits under the [memorandum of understanding]."  According to Roe, the remedy of "backpay is inherently contractual" and "*this action* (No. C-820295) is indeed 'about a contract.' " We agree with the Department that Roe's argument is not persuasive.  It simply mischaracterizes the litigation and then "reasons backwards from the remedy."  Nor is Roe's argument supported by the cases on which he relies.  (See, e.g., *Genest, supra,* 154 Cal.App.4th 1012; *Fugitt, supra,* 70 Cal.App.3d 868; *Harris, supra,* 170 Cal.App.3d 639, disapproved on another point in *Coleman v. Department of Personnel Administration, supra,* 52 Cal.3d at p. 1123, fn. 8; *Bell v. Farmers Ins. Exchange* (2006) 135 Cal.App.4th 1138 (*Bell*).)

In *Genest,* the Teachers' Retirement Board filed a petition for writ of mandate and complaint for injunctive and declaratory relief against the state, asserting that the state had violated its contractual obligation to make contributions to a pension benefits fund. The superior court entered judgment in the plaintiff's favor and awarded prejudgment and postjudgment interest at the rate of 7 percent per annum.  (154 Cal.App.4th at pp. 1024– 1026.)  On review, the Third District agreed that the state had breached an express contractual obligation.  (*Id.* at pp. 1030–1032, 1036, 1045.)  The court also decided that the plaintiff was entitled to prejudgment interest at the rate of 10 percent per annum because "Civil Code section 3289 specifies that the applicable interest rate for prejudgment interest *in breach of contract cases* is 10 percent.  This rate, set by the Legislature, from which public entities are not excepted, replaces the default rate in the California Constitution for instances in which the Legislature has not acted to set another

15

rate.  Having made state and public entities liable for prejudgment interest *on all contract claims*, whether liquidated or unliquidated, the interest rate set forth for such claims in Civil Code section 3289 necessarily applies to these entities absent an express legislative exemption." (*Genest*, at p. 1045, italics added.)

In *Fugitt*, *supra,* 70 Cal.App.3d 868, two probationary city employees were terminated from their employment and sought a writ of mandate requiring the City of Placentia to pay their wages and other benefits for the period they were prevented from working due to wrongful discharge.  (*Id.* at p. 870.)  Because civil service rules limiting removal were inapplicable to the petitioners, they relied on a memorandum of understanding to support their claim for benefits.  (*Id.* at pp. 871, 874–875.)  The *Fugitt* court held that if the discharges were arbitrary and capricious under the memorandum's grievance proceedings, then the employer must either impose a less serious form of discipline not subject to such procedures or reinstate the plaintiffs with backpay for the period during which they were wrongfully deprived of their positions.  (*Id.* at p. 875 & fn. 2.)  The court explained, "It is clear from a review of the memorandum of understanding that the [City of Placentia is] under a duty to pay petitioners' salaries pursuant to the schedule adopted in the memorandum of understanding unless that duty is legally extinguished. [¶] Here the [City of Placentia] attempted to extinguish [its] duty to pay petitioners' salaries by terminating their employment.  Thereupon the petitioners invoked the grievance procedure established by the memorandum of understanding." (*Id.* at p. 872.)  "The effect of article XVI of the memorandum of understanding is to give probationary employees the right not to be arbitrarily and capriciously discharged.  This right is a part of his employment contract just as in the case of a civil service employee. '*A wrongfully discharged employee, both private and public, is entitled to damages which tend to make him whole; in short, compensatory damages*.  (Civ. Code, § 3300.)[8]'

---

8 "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or

16

(*Currieri v. City of Roseville* [(1975)] 50 Cal.App.3d 499, 507.)  Mandamus is proper to compel the payment of back salary to a city employee for the period during which he was wrongfully discharged." (*Fugitt,* at p. 876, italics added & parallel citation omitted.)

In *Harris, supra,* 170 Cal.App.3d 639, a California State University employee took an absence without leave and was deemed to have automatically resigned.  (*Id.* at p. 641.)  After an adverse decision by the Board, he filed a petition for mandamus, which resulted in a new decision reinstating him.  The question on appeal was whether he was entitled to backpay upon reinstatement.  (*Id.* at p. 642.)  In concluding that the employee's backpay claim under the former Tort Claims Act (former Gov. Code, § 810 et seq.), the court observed:  "The shield provided government [by the Tort Claims Act] expressly excludes actions arising on contract.  [Citations.]  Appellant's claim is for wages he alleges are owed to him by his employer arising out of his contract of employment.  He seeks no damages for tortious conduct.  He seeks payment for services he was to have rendered and wages he would have earned but for his involuntary discharge and the long delay before reinstatement. . . . His mandamus action, therefore, is not subject to demurrer for failure to comply with the Tort Claims Act." (*Id.* at p. 643.)

*Genest* and *Fugitt* are distinguishable because they directly involved contract disputes.  (*Genest, supra,* 154 Cal.App.4th at p. 1045; *Fugitt, supra,* 70 Cal.App.3d at pp. 875–876.)  The Department concedes that *Harris* is not so clearly distinguishable because it "concerned a claim for backpay to remedy a *Skelly*-type violation." Nonetheless, we cannot read any of these cases to support the proposition that *Skelly* claims are contract claims for the purposes of awarding prejudgment interest under Civil Code section 3289.  None of the opinions address such an argument.  Opinions are not authority for propositions not considered.  (*People v. Avila* (2006) 38 Cal.4th 491, 566.)

Roe also relies on a wage and hour case, *Bell, supra,* 135 Cal.App.4th 1138, in which Division One of this court held that prejudgment interest at the rate of 10 percent

which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.)

17

accrues on unpaid overtime compensation recovered under Labor Code section 1194. In *Bell*, the plaintiff employees filed a class action alleging their employer had refused to pay overtime compensation for hours worked. (*Id.* at pp. 1141, 1150.) The question was whether Labor Code section 218.6,[9] which as of January 1, 2001, incorporated the interest rate provided by Civil Code section 3289 for breach of contract actions, applied only prospectively or whether it simply clarified existing law. (*Bell*, at p. 1142.)

After concluding that the defendant had waived its objection to the 10 percent interest rate by expressly agreeing to it, the *Bell* court went on to address the plaintiffs' contention that, "[b]efore [Labor Code] section 218.6 expressly required the use of the breach-of-contract rate for prejudgment interest, this rate was still the appropriate rate for unpaid wage claims because of the contractual nature of the employment relationship." (*Bell, supra,* 135 Cal.App.4th at pp. 1142, 1145–1146.) It said, "The language of Labor Code section 218.6 has an inclusive breadth that supports its retroactive application. . . . The use of the word 'all' and the form of the statute as a directive to the court appears to reflect a legislative intent that judicial awards of due and unpaid wages should bear the contract interest rate without exception and hence without regard to when the right to the award accrued. [¶] The language is also compatible with the premise that the Legislature intended the statute to clarify existing law. . . . [¶] . . . [S]trong and persuasive authority favored the application of Civil Code section 3289 even before it was expressly made applicable to unpaid wages with the enactment of Labor Code section 218.6. . . . [¶] The plaintiffs' argument for application of the breach-of-contract interest rate is based on the principle that the employment relationship is itself ' "fundamentally contractual" ' (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 335; see also Lab. Code, § 2750) and the contractual duties of the employer implicitly include performance of mandatory statutory

---

[9] "In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable . . . ." (Lab. Code, § 218.6.)

18

duties, such as the payment of overtime wages." (*Bell,* at pp. 1146–1147, italics added & parallel citation omitted.)

In reaching its conclusion, the *Bell* court distinguished *Currie, supra,* 24 Cal.4th 1109, 1118–1119, in which our Supreme Court held that the award of backpay under Labor Code section 132a, to an employee wrongfully denied reinstatement because of an industrial injury, should include prejudgment interest under Civil Code section 3287, subdivision (a), rather than only postjudgment interest. "[*Currie*] contains no discussion at all of the applicable rate of interest—section 3287 is silent on the interest rate—but it would be distinguishable even if it [contained some explicit discussion of the applicable rate of interest]. [Labor Code] [s]ection 132a is a remedial provision under the Workers' Compensation Act, *which entitles an employee to backpay for periods that were not worked*, and thus the recovery of backpay under the statute lacks the connection with an employment relationship present in an action for wages earned but unpaid." (*Bell, supra,* 135 Cal.App.4th at p. 1148, italics added.)

Here, unlike in *Bell*, the Department did not expressly agree to a 10 percent rate of prejudgment interest. More importantly, unlike the plaintiffs in *Bell* and the cases that court relied on, Roe has not brought an action for "wages earned but unpaid." (*Bell, supra,* 135 Cal.App.4th at p. 1148.) Roe has been awarded backpay for periods that he did *not* work to remedy a procedurally improper termination. Thus, this case is more akin to *Currie* than *Bell*. The distinction is reflected in *Miller v. State of California* (1977) 18 Cal.3d 808, in which our Supreme Court said, "Although the tenure of a public employee is not ordinarily based on contract, it is well established that 'public employment gives rise to certain obligations which are protected by the contract clause of the Constitution, including the right to the payment of salary *which has been earned*.' (*Kern v. City of Long Beach* [(1947)] 29 Cal.2d 848, 853.)" (*Miller,* at p. 815, italics added.)

We agree with the Department that "[a] *Skelly* violation is not a contract breach. A *Skelly* violation entitles an employee to salary-based damages for periods the employee did not actually work." We decline Roe's invitation to hold that the contract interest rate

should apply whenever the nature of the relief awarded bears some semblance to contract damages. The superior court erred in concluding that Civil Code section 3289 applies to *Skelly* claims for violations of due process. Prejudgment interest on backpay awarded on such a claim accrues at the default rate of 7 percent.

C.    *September 1992 Salary*

In his cross-appeal, Roe argues that substantial evidence does not support the Board's finding that he was paid his September 1992 salary. In its October 2006 Decision, the Board explained: "[Roe] testified he did not receive any compensation for the month of September 1992 and that he received a letter from an attorney for [the Department] in March 1993 that indicated [the Department] would not pay him for that month. [¶] Rosemary Rodrigues, a Department Personnel Analyst, testified that the Department paid [Roe] his salary for the month of September 1992. The payment was made sometime in 1993 and was corroborated by a Statement of Corrected Income and Tax Amounts. Based on the tax material provided, it is concluded that [Roe] was paid for September 1992, but such payment was not given to him until 1993." Judge Roesch remanded the matter to the Board to reconsider the evidence, explaining, "it appears that the evidence cited does not lead to the conclusion reached . . . ." In its December 2011 Decision, the Board said: "[T]he testimony of [Rodrigues] . . . contradicts [Roe's] testimony. . . . Rodrigues testified that [Roe's] September 1992 salary was paid by two checks issued on December 17, 1992, and a third check issued on January 5, 1993, for a total of $7,124.00. [Roe's] salary in September of 1992 was $7,124.00. The payment history does not indicate that any of the three checks were returned or deposited to the [Department]. Thus, it appears that while the parties were engaged in a dispute regarding whether or not [Roe] should be compensated for September of 1992, the [State Controller's Office] paid [Roe] for September of 1992. [¶] Accordingly, after reconsideration of the evidence, the Board's finding that [the Department] compensated [Roe] for September of 1992 is substantiated."

Roe challenges the sufficiency of the evidence supporting the Board's finding, by pointing to the transcript from the September 1, 1993 Board hearing, in which Deputy

Attorney General Vincent Scally testified, "we have not paid [Roe his] salary for [the September 1992] time period." Roe also relies on a letter, dated March 17, 1993, in which Scally wrote to Roe's counsel, "[Y]ou have requested on [Roe's] behalf payment of salary through September 24, 1992. . . . [T]he Department must decline your request. [¶] . . . Without Board approval, the effective date of the adverse action has not been amended and thus the Department has no authority to pay [Roe] salary beyond August 31, 1992."

At the Board's April 13, 2005 hearing, Roe testified that he had not received payment for his September 1992 salary. When Roe received a W-2 reflecting that he had been paid for that period, he contacted a supervisor in the Department's personnel division who told him, in March 1994, that she had the check. Accordingly, Roe testified that his 1992 and 1993 W-2 forms were adjusted to reflect a decrease in the amount of wages paid. Roe presented corrected W-2 forms from 1992 and 1993, showing total pay of $89,661.64. If a lump sum vacation payment of $33,565.30 is subtracted from this total, as Roe suggests, one could infer that, in 1992, Roe was paid less than eight months' salary. The evidence, although not conclusive on the subject, is susceptible of the inference that the September 1992 warrant was issued but never provided to Roe. If the Board had believed Roe and found that he had not been paid for September 1992, this evidence would support that finding. But, the evidence does not compel such a finding.

The Board relied on Rodrigues's testimony. Relying on payroll records she received from the State Controller's Office, which show warrants being issued, Rodrigues testified that the Department paid Roe for September 1992. She confirmed that a warrant being issued does not necessarily mean that it was cashed by Roe. But, she also testified, "If [the warrant was redeposited, it] would reflect as a negative check with a negative on it." Contrary to Roe's assertion, the record certainly does not unambiguously show that the September 1992 warrant was "redeposited" on April 19, 1994.

The Board reasonably relied on the personnel records and Rodrigues's testimony to find that Roe had been paid his salary for September 1992. The inference drawn by

21

Rodrigues and the Board is not contrary to uncontradicted evidence, as Roe suggests.[10] (See *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633, fn. 4 [" '[r]easonable' inferences do not include those which are contrary to uncontradicted evidence"].) That the Board could have fairly reached another finding, based on the evidence Roe presented, does not make the Department's evidence insubstantial.

D.       *Mitigation Offsets*

Roe also maintains that the Board erroneously deducted excess mitigation from his backpay award. "The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment. [Citations.]" (*Parker v. Twentieth Century-Fox Film Corp*. (1970) 3 Cal.3d 176, 181–182 (*Parker*), fn. omitted; *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 870–871.)

After being dismissed by the Department, Roe began working for the Farrow Law Firm (Farrow). He worked for Farrow, at a monthly salary of $6,250, between approximately December 20, 1992, and April 20, 1993. Roe then took a job with Ropers, Majeski, Kohm & Bentley (Ropers), as a senior associate, beginning in 1993. He remained employed by Ropers, at a monthly salary of $7,500, until June 26, 1995. At the April 2005 hearing, Roe testified that in 1993 he earned $15,171 from independent contract work. In 1994 and 1995, he earned $17,384 and $13,010, respectively, from similar work. He explained, "[I]n addition to the Ropers regular job . . . it was like a

---

[10] In 1999, the Department wrote in one of its briefs, "the dismissal should stand with an effective date of September 24, 1992, requiring a back pay award for the additional 24 days." As late as July 17, 2001, the Department represented in a brief that it was "ready and willing to pay petitioner all salary and benefits through September 24, 1992, with interest from that time at the legal rate, once the decision of the [Board] becomes final either through [Roe]'s acceptance thereof or finality of the judicial process." Contrary to Roe's assertion, these are not "uncontradicted admissions" that Roe had not theretofore been paid his September 1992 salary.

second job. I was working full time at Ropers, and I was working part time on some of these other matters."

1. *Application of Government Code Section 19584*[11]

First, Roe contends that the Board erred by deducting from his backpay award the full salary he earned at Farrow between December 1992 and April 1993. According to Roe, he had no obligation to mitigate damages for the first six months of the backpay period, pursuant to a statutory grace period found in section 19584. The Board and superior court disagreed, concluding that section 19584, including its mitigation grace period, does not apply.

" ' "Statutory construction is a question of law which requires the exercise of our independent judgment." [Citation.]' [Citation.] 'We apply well-settled principles of statutory construction. Our task is to discern the Legislature's intent. The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' [Citation.] ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . "[A] construction making some words surplusage is to be avoided." [Citation.] "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' [Citation.] [¶] '[W]e give great deference to the agency's interpretation of statutes affecting issues

---

[11] Undesignated statutory references are to the Government Code.

within its administrative sphere.' [Citation.] However, we 'do not necessarily defer to [the Board]'s interpretations of the governing statutes. [Citation.] The judiciary takes ultimate responsibility for the construction of statutes, although according great weight and respect to the administrative construction such as is appropriate under the circumstances.' [Citation.]" (*Department of Corrections & Rehabilitation v. State Personnel Bd.* (2014) 227 Cal.App.4th 1250, 1256.)

Section 19584 provides: "Whenever the board *revokes or modifies* an adverse action *and orders that the employee be returned to his or her position*, it shall direct the payment of salary and all interest accrued thereto, and the reinstatement of all benefits that otherwise would have normally accrued. 'Salary' shall include salary, as defined in Section 18000, salary adjustments and shift differential, and other special salary compensations, if sufficiently predictable. Benefits shall include, but shall not be limited to, retirement, medical, dental, and seniority benefits pursuant to memoranda of understanding for that classification of employee to the employee for that period of time as the board finds the adverse action was improperly in effect. [¶] Salary shall not be authorized or paid for any portion of a period of adverse action that the employee was not ready, able, and willing to perform the duties of his or her position, whether the adverse action is valid or not or the causes on which it is based state facts sufficient to constitute cause for discipline. [¶] From any such salary due there shall be deducted compensation that the employee earned, or might reasonably have earned, during any period *commencing more than six months after the initial date of the suspension*." (Italics added.)

Section 19584 does not apply because Roe was not returned to his position. Roe contends that he was "temporarily reinstated" as a result of the Department's due process violation. Despite any statement to the contrary in the Board's October 2006 Decision, Roe was not reinstated. In *Roe III,* we concluded that the Board erred as a matter of law in concluding that Roe's posttermination resignation was effective. (*Roe III, supra*, 120 Cal.App.4th at p. 1039.) We remanded for the Board to make a determination on the merits of Roe's dismissal. (*Id.* at p. 1043.) We also made clear, in the unpublished

24

portion of *Roe III*, that "Roe is *not* entitled to reinstatement pending the Board's determination because . . . the remedy for the *Skelly* violation is damages, *not reinstatement*. (*Kirkpatrick v. Civil Service Com.*[, *supra*,] 77 Cal.App 3d [at pp.] 945–946; see also *International Brotherhood of Electrical Workers v. City of Gridley* (1983) 34 Cal.3d 191, 209; *Williams v. City of Los Angeles*[, *supra*,] 220 Cal.App.3d. [at p.] 1217.)" (Italics added.) The Board has since determined that Roe's dismissal was proper. That determination is now final.

Contrary to Roe's assertion, *Skelly* does not suggest a different interpretation of section 19584. *Skelly* involved an employee whose dismissal was deemed "excessive and disproportionate to the misconduct on which it was based." (*Skelly, supra,* 15 Cal.3d at p. 219.) Roe's limited remedy is provided by our Supreme Court in *Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395 (*Barber*). *Barber,* like the matter before us, involved discipline that was ultimately upheld but which had been imposed via pretermination procedures that violated due process. In concluding that *Skelly* should be applied retroactively (*Barber,* at pp. 400, 404–405), our Supreme Court observed, "because *a wrongfully disciplined* employee has always been entitled to compensation for the period of wrongful punitive action (§ 19584), retroactive application will benefit only those persons adjudged at the substantive hearing to have been properly disciplined. [¶] . . . [¶] . . . The remedy for the employee in these cases is to award back pay for the period of wrongful discipline. [Citations.] Thus, damages consist only of back pay for the period discipline was improperly imposed, i.e., from the date of actual discipline to the time discipline was validated by the hearing. . . . [¶] . . . [¶] The constitutional infirmity of the disciplinary procedures used in the present case was the imposition of discipline prior to affording the employee notice of the reasons for the punitive action and an opportunity to respond. (*Skelly*[, *supra*,] 15 Cal.3d at p. 215.) This infirmity is not corrected until the employee has been given an opportunity to present his arguments to the authority initially imposing discipline. [(*Ibid.*)] Under the procedures applied to plaintiff, the constitutional vice existed until the time the board rendered its decision. Prior to that time, the discipline imposed was invalid. . . . The proper period for

measuring the amount of back pay due therefore begins at the time discipline is actually imposed and ends on the date the board files its decision." (*Barber,* at pp. 401–403, italics added & omitted.)

*Barber* does not suggest that section 19584 applies to Roe. Roe was not "wrongfully disciplined." His dismissal was sustained. In a case, such as this one, where a civil service employee was denied his *Skelly* rights to pretermination due process of law, but the discipline imposed was not improper, "the proper remedy for a *Skelly* violation is an award of backpay for the period described in *Barber*, rather than reinstatement. (*International Brotherhood of Electrical Workers v. City of Gridley*[, *supra,*] 34 Cal.3d [at p.] 209.) The reason for this rule was explained in the decision in *Kirkpatrick v. Civil Service Com., supra*, 77 Cal.App.3d 940, which held the lower court erroneously had ordered reinstatement as a remedy for a *Skelly* violation. The appellate court stated: 'The minimal due process rights required by *Skelly* prior to discharge are merely anticipatory of the full rights which are accorded to the employee after discharge. The employee can exercise those rights at the subsequent hearing, and if that hearing shows that there were good grounds for dismissal, the employee is not entitled to reinstatement; he is merely entitled to damages for the limited time period in which discipline was wrongfully imposed, i.e. , the employee is entitled to back pay for the period from the time discipline was actually imposed to the date the commission filed its decision validating the dismissal. [Citations.]' (*Id.* at [pp.] 945[–946] . . . .)" (*Williams v. City of Los Angeles, supra,* 220 Cal.App.3d at p. 1217, italics omitted.)

The Board did not err in concluding section 19584 does not apply. Having suffered little delay in obtaining new employment, we see no compelling reason to award a windfall to Roe for the relevant six-month period.

2. *Moonlighting*

Next, Roe contends that the independent contract work he performed, between 1992 and 1995, was "extraordinary work," which generated earnings that should not have offset his backpay award because such work "exceeds the duty to seek comparable

26

employment" and because it "resulted in 'mitigation' that exceeded the salary Roe would have earned at [the Department]."

In determining the amount of back salary to be awarded, the Board rejected Roe's claim. The Board explained: "[Roe] characterized his 'business earnings' between 1992 and 1995 as 'moonlighting' or a 'second job.' However, he also testified that his employment with Farrow was a four-month contract and that his employment with Ropers was based on the understanding that it was for a two year term. [Roe] then elected to pursue self-employment. No testimony established whether [Roe] was subject to a traditional 40-hour workweek while employed under the contracts. [¶] . . . [Roe] argues that the 'business earnings' he earned during the time he was at Farrow and at Ropers are attributable to a 'second job' and should not be considered as part of [the Department's] offset. The problem with [Roe's] claim, however, is that there is no way to determine whether the work was performed as a second job while employed as a contract attorney or while he was self-employed. Consequently, the amounts in question will be considered as part of the offset. [¶] Moreover, the parties submitted no evidence to establish that [Roe] worked at a similar 'second job' while employed by the Department, or that he requested to do so, but the Department denied his request. Had [Roe] established a pattern of 'moonlighting' while with the Department, or even that he had requested permission to 'moonlight' or noticed the Department that he was doing so, [Roe's] argument might be more viable."

In maintaining that the disputed income should not be deducted from his backpay award, Roe relies primarily on *Villacorta v. Cemex Cement, Inc*. (2013) 221 Cal.App.4th 1425, 1432 (*Villacorta*) and *Wise v. Southern Pac. Co.* (1970) 1 Cal.3d 600 (*Wise*). In *Villacorta*, the Fourth District concluded, "Wages actually earned from an inferior job may not be used to mitigate damages because if they were used then it would result 'in senselessly penalizing an employee who, either because of an honest desire to work or a lack of financial resources, is willing to take whatever employment he can find.' [Citation.]" (*Villacorta,* at p. 1432.) We do not find this statement persuasive because it is not supported by the authority on which it relies.

27

The *Villacorta* court relied on *Parker, supra,* 3 Cal.3d 176 and *Rabago-Alvarez v. Dart Industries, Inc.* (1976) 55 Cal.App.3d 91 (*Rabago-Alvarez*). (*Villacorta, supra*, 221 Cal.App.4th at p. 1432.) But neither case supports its proposition. Our Supreme Court explained in *Parker*, "[B]efore *projected earnings* from other employment opportunities not sought or accepted by the discharged employee can be applied in mitigation, the employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages. [Citations.]" (*Parker, supra,* 3 Cal.3d at pp. 181–182, italics added.)

*Rabago-Alvarez* also involved projected income, not actual income earned. In that case, that plaintiff was unable to obtain any employment comparable to her position with the defendant employer. She was only able to obtain part-time work, at a salary much lower than she had been paid by the defendant. (*Rabago-Alvarez, supra,* 55 Cal.App.3d at p. 99.) The plaintiff conceded that her actual earnings from such inferior work must be deducted, but asserted that by accepting such employment she did not waive her right to decline other inferior employment opportunities. (*Id.* at pp. 97–99.) The reviewing court only concluded that "the trial court should not have deducted from plaintiff's recovery . . . the amount that the court found she *might have earned* in employment which was substantially inferior to her position with defendant." (*Id.* at p. 99, italics added.)

In contrast to *Parker* and *Rabago-Alvarez*, Roe contests the Board's deduction of income he actually earned, not projected income. "The obligation to reimburse a wrongfully discharged employee may be mitigated by deducting compensation or benefits actually received by the employee that are inconsistent with the original employment . . . ." (*Bevli v. Brisco* (1989) 211 Cal.App.3d 986, 994; see also *Mass v. Board of Education* (1964) 61 Cal.2d 612, 629, fn. 12 ["[n]ot all earnings would be deductible; for example, earnings from night or weekend work, which would not have been inconsistent with school employment, are not to be deducted"]; *Beseman v. Remy* (1958) 160 Cal.App.2d 437, 445 ["[s]uch additional income was not considered in

mitigation of damages and correctly so, for the time of teaching required at the two schools being the same, additional income could be earned at either place"].)

*Wise*, *supra,* 1 Cal.3d 600, is also distinguishable. The *Wise* court rejected a defendant employer's argument that it was entitled to an additional mitigation offset when the former employee received more from his new employment than he would have been paid by defendant. (*Id.* at pp. 602, 607.) The Supreme Court explained, "[T]he evidence shows that during a portion of that time plaintiff was holding down both a full-time regular job, and a second, temporary, part-time job; that the excess earnings were brought about by the part-time work; *and that the latter was work which plaintiff could also have performed while he was employed by defendant.* Accordingly, defendant is not entitled to include the part-time earnings in calculating mitigation. [Citation.]" (*Id.* at p. 607, italics added.)

Here, Roe has not shown that he would have been permitted to "moonlight" while employed by the Department. In fact, it appears that he would not have been permitted to engage in the private practice of law while employed by the Department. (See *Gibson v. Office of Atty. Gen., California* (9th Cir. 2009) 561 F.3d 920, 927–928 [Department lawyers shall not "engage in the private practice of the law" except as approved by the Attorney General to "close pending legal matters" when first employed by the Department or to "handle personal and family legal matters in which there is no conflict with his duties as a[n] employee of the state"].)

Had Roe remained employed with the Department he would not have been able to perform independent legal contract work. The Board did not err in declining to award Roe a windfall.

3.      *1995 Salary*

Next, Roe contends that the Board deducted excess mitigation by "double-counting" a month of salary he earned at Ropers in 1995. The Board found, in its October 2006 Decision, that Roe earned $61,139.62 in 1995. We review that finding for substantial evidence. (*Skelly, supra,* 15 Cal.3d at p. 217, fn. 31.)

29

Roe testified that, in 1995, Ropers paid him $7,500 per month until he was laid off on June 26, 1995. Thereafter, Ropers paid Roe one month of severance pay. Roe's 1995 W-2 shows that Ropers reported paying him $52,644.62 in "wages, tips, other comp." The W-2 also reports "Year to Date Earnings" of $51,937.50 in "Gross Pay Salary," $812.12 in "Bonus Gross Up," $890 in "Auto Allowance," and $7,500 in "Severance Pay." This totals $61,139.62. The Board used the "larger amount" from the W-2 because "year to date earnings that included a bonus and severance pay totaled $61,139.62."

Roe acknowledges that the Board merely "derived the higher amount by adding all items [from the] 'Earnings' column on the W-2 statement." He asserts, "[N]o evidence supports the exercise. The listed Severance Pay ($7,500.00) is included in the listed Gross Pay Salary ($51,937.50), as six months of $7,500 salary through all of June would only be $45,000. Adding the two items constitutes improper double-counting. [¶] Moreover, the informational column includes an Auto Allowance ($890.00) that reimburses employees for commuting expenses. Because it is similar to a monthly commuting allowance that [Department] provided to its employees at that time, the allowance cannot properly be treated as mitigation."

Roe cites nothing in the record to support these assertions. The employer may have the burden to prove mitigation of damages. (*Parker, supra,* 3 Cal.3d at pp. 181–182.) But the Department met that burden when it presented the 1995 W-2, on which the Board relied. The W-2 is substantial evidence. Roe's backpay was calculated using the gross pay he would have been paid by the Department. Roe presents no authority supporting the proposition that it is impermissible to offset his gross pay, including severance pay, bonus, and automobile allowance, in mitigation of his backpay. The Board's finding is supported by substantial evidence.

E.      *Out-of-Pocket Health Expenses*

Roe also argues that the Board improperly declined to order reimbursement for out-of-pocket health expenses, incurred after May 5, 1999, and before 2007, that would have been covered by retiree health insurance.

The Board, in its October 2006 Decision, explained: "[G]iven the Board's finding that an appropriate remedy for the Department having violated [Roe's] *Skelly* rights is to defer the effective date of [his] dismissal to May 5, 1999, the Board necessarily finds that [Roe] is entitled to be compensated for those health, dental and vision care benefits that he would have accrued between September 1, 1992 and May 5, 1999." Roe was also afforded the opportunity to enroll in health, dental, and vision insurance plans under appropriate PERS retiree programs because he would have become eligible for such retirement benefits in January 1994. He was enrolled in PERS retirement insurance plans in 2007.

The Board also determined that "because [Roe's] fringe benefits include medical, dental and vision insurance, [Roe] should be compensated for the loss of those benefits between September 1, 1992 and May 5, 1999, if he can establish that he purchased substitute insurance coverage or has incurred, insured or uninsured, out of pocket medical expenses that would not have been incurred had he been insured *under the PERS health, dental and/or vision insurance plan*(*s*) *he was enrolled in on August 31, 199*[2]." (Italics added.) The Board remanded the matter to an ALJ to determine "whether, *between September 1, 1992 and May 5, 1999*, [Roe] purchased substitute health . . . insurance coverage or has incurred . . . out of pocket medical expenses that he would not have incurred had he been insured *under the PERS . . . insurance plan*(*s*) *he was enrolled in on August 31, 199*[2]." (Italics added.) In the 2008 Writ of Mandate, Judge Roesch ordered the Board to determine whether awarding compensation for medical expenses that would have been covered by PERS retiree plans, but were incurred by Roe outside the backpay period, "in addition to the amounts incurred between [September 1, 1992 and May 5, 1999,] is more consistent with the principle of awarding Roe appropriate compensation for the period in which he was denied his *Skelly* rights."

Ultimately, evidence of Roe's medical expenses incurred through his 2007 PERS enrollment was received, but the Board concluded in its December 2011 Decision that "[Roe] has not provided persuasive authority to change the prior determinations that he is not entitled to health-related costs beyond May 5, 1999." It explained: "[Roe]

31

improperly relies on . . . section 22836, which provides that reinstated employees are entitled to coverage or benefits during the interim of the illegal removal.  Other cases cited by [Roe] establish only that backpay includes health care benefits. [¶] Accordingly, limiting [Roe's] right to health-related expenses to the period from September 1, 1992, through May 5, 1999, is consistent with the findings and principles discussed in the [October 2006 Decision], and will not be deleted . . . ."

In his opening brief on the cross-appeal, Roe asserts "section 22836[12] applies contract damage principles where health benefits were lost due to wrongful discipline." It is true that "the measure of damages for breach of contract is 'the amount which will compensate the party aggrieved for all the detriment proximately caused thereby . . . .' (Civ. Code, § 3300 . . . .)"  (*Wise, supra,* 1 Cal.3d at p. 608, italics omitted; see also *Fugitt, supra,* 70 Cal.App.3d at p. 876 [relying on Civ. Code, § 3300 to state that " '[a] wrongfully discharged employee, both private and public, is entitled to damages which tend to make him whole; in short, compensatory damages' "]; *Harris, supra,* 170 Cal.App.3d at p. 644 [California has "a general policy favoring full backpay awards upon reinstatement to a position because the compensation awards are designed to make the employee whole"].)  However, as we concluded above, this is not a breach of contact case and Roe *was not* reinstated.  Section 22836 does not apply.

The gist of Roe's remaining argument is this:  "*Because* [*the Board's*] *1999 decision erroneously* denied all health benefits from September 1992 to May 1999, Roe was compelled to continue paying for premiums and other health expenses until [the Board] corrected its error pursuant to *Roe III.* . . . [¶] . . . [¶] . . . 'It is unfair to deny eight

_____

12 "An employee enrolled in a health benefit plan who is removed or suspended without pay *and later reinstated or restored to duty* on the ground that the removal or suspension was unjustified, unwarranted, or illegal may not be deprived of coverage or benefits for the interim.  Any contributions otherwise payable by the employer that were actually paid by the employee shall be restored to the same extent and effect as though the removal or suspension had not taken place, and any other equitable adjustments necessary and proper under the circumstances shall be made in premiums, claims, and other charges."  (§ 22836, italics added.)

years of health expenses which were incurred because [the Board] failed to award proper backpay in 1999.' " But, Roe presents no authority supporting his argument that the Board's delay entitles him to effectively extend the backpay period beyond 1999.[13]

In *Roe III* we did not determine what medical expenses should be covered by the backpay award, but we delineated the limits of the backpay period: "An employee terminated without being afforded *Skelly* procedural protections is entitled to an award of backpay from the date of dismissal *until the date of correction of the constitutional infirmity*. (*Barber, supra,* 18 Cal.3d at p. 403.)" (*Roe III, supra*, 120 Cal.App.4th at p. 1039, italics added.) We also rejected Roe's argument, similar to the instant claim, that "only a [Board] decision upholding his dismissal can cut off his entitlement to backpay." (*Id.* at p. 1042.) We explained: "Although in both *Barber, supra*, 18 Cal.3d 395, and *Kempland* [*v. Regents of University of California* (1984)] 155 Cal.App.3d 644, the [Board] decisions upheld the dismissals at issue, the key to curing the *Skelly* violation is providing the employee an opportunity to respond to the accusations, not the nature of the eventual decision. . . . *Skelly* does not guarantee the propriety of the ultimate decision. . . . [O]nce the Board issued [its 1999] decision, Roe was no longer subject to dismissal without due process. Instead, he was subject to a Board decision rendered after a full and fair hearing on the merits. The conclusion that Roe effectively resigned was in error, but it was not in violation of Roe's *Skelly* rights. For the *Skelly* violation, Roe is entitled to backpay for the period September 1, 1992, through May 5, 1999, the date the [Board] adopted the ALJ's proposed decision." (*Roe III,* at p. 1042.)

Once again Roe is arguing that the backpay period should be extended because the Board, in its 1999 decision, reached an erroneous conclusion. We continue to reject that principle. He has received the sum that the Department would have paid for his health, dental, and vision premiums had Roe remained employed during the backpay period. He has been enrolled in a retirement health plan. We decline to hold the employer liable for

---

[13] Roe misplaces his reliance on *Thorning v. Hollister School Dist.* (1992) 11 Cal.App.4th 1598 and related authority. *Thorning* stands only for the proposition that an employee's pension benefits, once vested, are constitutionally protected.

additional amounts which were incurred after the date of correction of the constitutional infirmity.

F.    *Calculation of Interest*

Finally, Roe contends that the Board erred by concluding that interest stopped accruing "on amounts [the Department] paid in 2007 for back salary, and in 2008 for vacation and holidays." Roe's argument relies on the premise that accrued interest was not fully paid, in either 2007 or 2008, by the Department because it was paid at 7 percent, rather than 10 percent. Having now determined that prejudgment interest accrued only at the rate of 7 percent, we need not further address Roe's argument.

## IV.    DISPOSITION

The superior court judgment is reversed only insofar as it provides for a rate of prejudgment interest at 10 percent. The matter is remanded for recalculation of prejudgment interest at a rate of 7 percent. The Department is to recover its costs on appeal.

 

_____
BRUINIERS, J.


WE CONCUR:


_____
SIMONS, Acting P. J.


_____
NEEDHAM, J.